## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

HEARTWOOD, INCORPORATED, et al.,  )
                                    )
        Plaintiffs,          )
                                    )
vs.                                    )     Case No. 3:25-cv-1850-NJR
                                    )
FELIPE CANO, et al.,         )
                                    )
        Defendants.      )

### BRIEF IN SUPPORT OF PLAINTIFFS' MOTION
### TO COMPLETE AND SUPPLEMENT THE ADMINISTRATIVE RECORD

Plaintiffs Wilderness Watch and Heartwood (collectively "Plaintiffs") challenge the completeness and adequacy of the administrative record filed on January 30, 2026, and supplemented on March 6, 2026. Several key documents missing from the record are necessary to ensure that the Court can fully evaluate the reasonableness of the Forest Service's decision to authorize the Lusk Creek Inholding Access Project (the "Project"). These documents were before the Forest Service at the time the decision was rendered or are necessary to fully understand the Project's scope. Accordingly, they must be added to the record.

### FACTUAL AND PROCEDURAL BACKGROUND

Defendants issued a Decision Memo dated January 21, 2025, constituting a final agency action, authorizing road construction and year-round motorized use through Lusk Creek Wilderness, and prompting Plaintiffs' claims. Complaint at ¶1. Defendants lodged what purports to be the full administrative record on January 30, 2026 (hereinafter, the "AR"). Plaintiffs notified Defendants that it believed several documents were missing from the AR. On March 6, 2026, Defendants supplemented the AR. Defendants excluded from the AR the Request for Project Input ("RPI"), the Archaeological Survey/Testing Short Report issued by the Illinois

State Historic Preservation Office for the Project (the "Archaeological Survey"), a form special

use permit (the "SUP"), and the operation and maintenance plan for the Project (the "O&M

Plan").[1]

<em>The RPI</em>

The RPI, dated October 9, 2024, is subtitled "Categorical Exclusion Review or

Preliminary Environmental Assessment Review." A true and correct copy of the RPI is attached

hereto as Exhibit 1. The RPI was produced to Wilderness Watch in response to a FOIA request

submitted on February 3, 2025. The RPI requests input from various agency staffers regarding

the proposed Project and does not include the submitted comments or any agency deliberation.

The RPI also documents the agency's application and evaluation of NEPA categorical exclusion

criteria for the Project under 36 C.F.R. § 220.6(b), through which the District Ranger authorized

proceeding to a Decision Memo without conducting an environmental assessment.

<em>The Archaeological Survey</em>

The Archaeological Survey, dated October 18, 2024, was prepared by the Agency after

its consultation with the Illinois State Historic Preservation Office and various other state and

federal agencies to ascertain whether culturally significant sites would be impacted by the

Project. The Survey was relied upon by the Forest Service in determining that the Project would

not have archaeological impacts and in deciding not to engage in further NEPA review. A

redacted copy of the Archaeological Survey was provided to Wilderness Watch in response to its

---

[1] Included among the materials Defendants added to the AR was a February 6, 2025 internal Forest Service email transmitting the O&M Plan and SUP (LuskAR002000), but not copies of the RPI, Archaeological Survey, O&M Plan, or the SUP. Defendants' counsel asserts that these documents are predecisional or deliberative, not public-facing, or that they post-dated the challenged decision. Plaintiffs disagree for reasons outlined herein.

FOIA request. An unredacted version of the Survey was also available on the Forest Service's Project page as recently as February of 2025, but has subsequently been removed from the site.[2]

*The O&M Plan*

The O&M Plan details the scope of the road construction authorized by the Project, including a map identifying "maintenance/improvement tasks" along the proposed route and as well as drainage, surface stabilization, and erosion mitigation. A true and correct copy of the O&M Plan is attached hereto as Exhibit 2. The O&M Plan specifies the types of motorized vehicles that are to be used to construct and maintain the road, the extent of horizontal and vertical clearing that is to be performed during road construction, outlines the type of drainage structures that are to be installed in conjunction with the roadway, specifies roadway materials and depth requirements, and outlines future maintenance requirements for the roadway. The O&M Plan was produced to Plaintiffs on March 3, 2026 in response to a FOIA request submitted on October 28, 2025.

*The SUP*

The SUP is a form of a special use permit intended to provide individual landowners with authorization to construct, use and maintain the Project roadway as specified in the O&M Plan. A true and correct copy of the SUP is attached hereto as Exhibit 3.

## LEGAL BACKGROUND

Plaintiffs' claims against Defendants in this case are brought pursuant to the Administrative Procedure Act. Complaint at ¶¶ 79–132. A court reviewing such claims must have before it the complete administrative record to determine whether an agency's decision is

---

[2] Because Defendants assert that the Archaeological Survey may be confidential, Plaintiffs have not attached a copy to this brief, but will make it available to the Court *in camera* upon request.

unlawful or is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). Arbitrary and capricious review under the APA requires courts to "engage in a substantial inquiry" and "a thorough, probing, in-depth review." Citizens to Preserve Overton Park. v. Volpe, 401 U.S. 402, 415 (1971). This Court's review of those claims should be based on the "the whole record or those parts of it cited by a party" before the agency at the time the decision was made. 5 U.S.C. § 706.

In order to conduct that kind of in-depth review, the record before the Court on an APA claim must include materials that illustrate whether Defendants' decision was "based on a consideration of the relevant factors," whether the agency "relied on factors Congress has not intended it to consider," or whether it "entirely failed to consider an important aspect of the problem," and it must include material that shows whether the ultimate decision "runs counter to the evidence before the agency." Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). As such, it is essential that the administrative record before the court include the "full administrative record" present before an agency at the time the agency made its decision. Overton Park, 401 U.S. at 420. See also, 5 U.S.C. § 706.

While the burden is on an agency to lodge the record, and courts will presume that the record as lodged by the agency is complete, in appropriate circumstances, courts may order that additions be made to the record. Bethlehem Steel Corp. v. EPA, 638 F.2d 994, 1000 (7th Cir. 1980). This is because "having the whole record before [the court] is crucial to the court's review under the APA." Miami Nation of Indians of Indiana v. Babbitt, 979 F. Supp. 771, 775 (N.D. Ind. 1996). "The reason is that the court cannot determine whether the final agency decision reflects the rational outcome of the agency's consideration of all relevant factors when the court has no idea what factors or data were in fact considered by the agency." Lloyd v. Illinois Reg.

4

Transp. Auth., 548 F. Supp. 575, 590 (N.D. Ill. 1982). As a result, the determination as to whether the record is whole, and if not, what should be added to it, is properly made by reviewing courts, which are empowered to complete or supplement the agency's administrative record to enable effective judicial review. Bethlehem Steel Corp., 638 F.2d at 1000.

"The complete administrative record consists of all documents and materials directly or indirectly considered by the agency." Miami Nation of Indians of Ind., 979 F. Supp. at 775 (citations omitted). "[A]ny document that might have influenced the agency's decision" should be part of the record. Bethlehem Steel Corp., 638 F.2d at 1000 (citing Nat'l Courier Ass'n v. Federal Reserve, 516 F.2d 1129, 1241 (D.C. Cir. 1975)). A document "need not literally pass before the eyes of the final agency decision maker to be considered part of the administrative record." Miami Nation of Indians of Ind., 979 F. Supp. at 777. Accordingly, this Court must ensure that the AR includes all material relevant to the process of the agency making its final determination, and if it is not, to add those materials to the record that are necessary to ensure the record is complete. Id. at 778.

Courts may also allow supplementation of extra-record materials to the record when (1) supplementation is necessary to determine whether the agency considered all relevant factors and explained its decision; (2) the agency has relied on documents not in the record; (3) supplementing the record is necessary to explain technical terms or complex subject matter; or (4) the plaintiff makes a showing of agency bad faith. Harrisonville Tel. Co. v. Illinois Commerce Comm'n, 472 F. Supp. 2d 1071, 1074 (S.D. Ill. 2006). Both completeness and supplementation factors come into play here, mandating additions to the record.

## ARGUMENT

**I.    This court should require Defendants to complete the administrative record with the RPI and the Archaeological Survey.**

The Court should order Defendants to complete the AR in this case with Exhibit 1, along with the Archaeological Survey.

> **A.    Plaintiffs have overcome the presumption that the administrative record produced by Defendants is complete.**

To overcome the presumption that the record produced by Defendants is complete, Plaintiffs must identify "reasonable, non-speculative grounds for their belief that the documents they seek to add to the administrative record were considered by the agency and not included in the record." Milwaukee Inner City Congregations Allied for Hope v. DOT, 2026 U.S. Dist. LEXIS 15481, *7 (E.D. Wis. 2026) (citations omitted). Here, Plaintiffs can demonstrate through reasonable, non-speculative grounds that the RPI, along with the Archaeological Survey, were considered by the Forest Service as they made their decision to allow a roadway to be constructed through the Lusk Creek Wilderness, as explained below. As a result, the record of the Agency's decision on the Project is incomplete without them, and this Court should require they be added to the AR.

> **B.    The Forest Service directly and indirectly considered the RPI in rendering its decision, warranting its inclusion in a complete record.**

The RPI is a factually based document that outlines the basis for Defendants' determination that the Project should be entitled to the NEPA categorical exclusion ("CE") applicable to special uses that require less than 20 acres of National Forest lands under 36 CFR § 220.6(e)(3). In this analysis, the RPI functions like a compliance checklist – it includes scoping dates, the identified decisionmaker, and a worksheet of legal requirements that must be satisfied

for the CE to apply. In this way, the RPI is a factual memo demonstrating that each district staff member completed their respective requirements.

The RPI also reveals the rationale underlying the agency's categorical exclusion determination. The document states that the project qualifies under 36 CFR § 220.6(e)(3) because it involves "the installation of a driveway or other facilities incidental to the use of a private residence." Ex. 1 at p. 2. The Decision Memo, however, does not rely on that rationale – and instead states only that the proposal qualifies because it requires less than twenty acres of National Forest System lands. LuskAR000224. Other decisional materials describe the same categorical exclusion differently. The Minimum Requirements Analysis states that the proposal was reviewed "with the intent to categorically exclude the analysis" under 220.6(e)(3) as applying to minor special uses "requiring less than five contiguous acres of land." LuskAR000017. These differing descriptions of the CE category underscore that the RPI contains the most detailed contemporaneous explanation of why the agency believed the project satisfied the categorical exclusion criteria. Because it documents the agency's reasoning for invoking the CE, the RPI is necessary to the Court to evaluate whether the administrative record accurately reflects the basis of the agency's decision.

**C.     Defendants also relied upon the Archaeological Survey in rendering their decision, requiring its addition to the record.**

The Archaeological Survey was clearly before the Agency as it rendered its decision on the project. In fact, the Survey was part of the Agency's public-facing project page until just after the decision was rendered by the Agency. The Survey outlines the techniques and results of a cultural resource investigation conducted for the Forest Service to ascertain whether or not the Project would impact culturally significant resources. It also outlines the result of prior surveys conducted in the Lusk Creek Wilderness.

The Survey also formed part of the information transmitted to Tribal governments during cultural resource consultation. For example, the consultation materials circulated to Tribal Historic Preservation Officers incorporated the Survey's description of the project footprint as approximately 19.73 acres. LuskAR000128. That figure originates from the Archaeological Survey. The consultation letters state that the Phase I Archaeological Survey for the Lusk Creek Inholdings was enclosed with the correspondence for tribal review and comment. LuskAR000128. Other project materials describe the same proposed road corridor as approximately 2.5 miles long and 12 feet wide, totaling approximately 3.64 acres. LuskAR000223. Because the survey provided factual information used in the Agency's consultation process and project description, it necessarily formed part of the information base underlying the Agency's decision and must be included in the administrative record.

In communications with Plaintiffs' counsel, the only objection Defendants make to inclusion of the Archaeological Survey in the AR is that the Survey contains culturally sensitive information and is therefore not a public facing document. This point was certainly undermined by the Agency's posting of the Survey on its public webpage for the Project prior to February of 2025. It is also undermined by the fact that the Agency produced a redacted copy of the Survey to Wilderness Watch in response to its FOIA request. At a minimum, this redacted version of the Survey should be added to the AR.

### D. Deliberative process privilege does not apply here.

Defendants asserted in correspondence with Plaintiffs' counsel that the RPI should be excluded wholesale from the record because it is predecisional and deliberative – citing Oceana, Inc. v. Ross, a D.C. Circuit opinion. 920 F.3d 855 (D.C. Cir. 2019). However, the Seventh Circuit has not adopted the reasoning in Oceana. Rather, in the Seventh Circuit, the "whole record" includes all materials "directly or indirectly considered" by the agency. Miami Nation of Indians

of Indiana, 979 F. Supp. at 775. Further, the privilege does not protect purely factual material.

Bobkoski v. Bd. of Ed., 141 F.R.D. 88, 91–93 (N.D. Ill. 1992). While the Seventh Circuit

recognizes the deliberative process privilege, it requires the department head or other responsible

high-level official from the agency invoking the privilege to set out "precise and certain" reasons

for preserving confidentiality, and "specifically identify and describe" the documents claimed to

be privileged. Rodriguez v. City of Chicago, 329 F.R.D. 182, 186 (N.D. Ill. 2019).

     In Miami Nation of Indians of Indiana v. Babbitt, the court applied these same principles

"in the spirit of Fed. R. Civ. P. 26(b)(5)" and treated them as procedural hurdles that the

Department of the Interior had to satisfy before it could withhold predecisional materials from

the administrative record. 979 F. Supp. at 778-79. The court explained that the agency must

"carefully consider and select which materials it contends are so privileged," that the claim must

be lodged by the agency head or appropriate delegate after personal review, and that the agency

must specifically designate the documents and give "precise and certain" reasons why each is

protected. Id. at 778-9. Only with that level of detail can a reviewing court determine which, if

any, documents are in fact privileged. Id. Vague, blanket assertions and mere offers of in camera

review have been found to be insufficient and could be construed as waiver of the privilege. Id.

     Here, Defendants have not satisfied any of the elements of the deliberative process

privilege test applicable in the Seventh Circuit. No declaration or affidavit from a head or high-

level delegate has been provided, nor have Defendants identified precise and certain reasons for

confidentiality. Instead of identifying specific documents or provisions within those documents

that are privileged, the Agency seeks to withhold the entire document seemingly because it

predates the decision. This is simply an erroneous and overly broad application of the

deliberative process privilege. At a minimum, Plaintiffs should be entitled to a privilege log identifying withheld documents and the rationales for doing so.

Further, <u>Oceana</u> is distinguishable from this case. In <u>Oceana</u>, the plaintiff did not move to complete the record by specifying documents that it alleged were improperly withheld. Rather, the defendant agency affirmatively asserted in its certified administrative record index that it withheld privileged documents, including those that fell within the scope of the deliberative process privilege. <u>Oceana</u>, 920 F.3d at 860. Plaintiffs here have instead identified, via submission as an exhibit to this Court, the very document that the Forest Service considered, yet omitted from the record. Defendants have failed to provide any information satisfying the elements of deliberative privilege with respect to the RPI and therefore cannot claim such privilege as grounds for excluding the document from the record.

### E.    Even if the Forest Service were entitled to withhold documents as privileged, deliberative materials, it waived the deliberative process privilege.

An agency waives its privilege by producing a document in response to a public inquiry. <u>Xirum v. ICE</u>, 2025 U.S. Dist. LEXIS 184245, *13 (S.D. Ind. 2025). As the Supreme Court warned, "[i]t must be remembered that once there is disclosure, the information belongs to the general public. There is no mechanism under FOIA for a protective order allowing only the requester to see whether the information bears out his theory, or for proscribing its general dissemination." <u>Nat'l Archives & Records Admin. v. Favish</u>, 541 U.S. 157, 174 (2004). Thus, if Defendants had a legitimate concern that these now disputed records would expose the agency's decision-making process in such a way as to discourage candid discussion within the agency and undermine its ability to perform its functions then presumably it would have invoked the deliberative process privilege at the FOIA stage. Instead, Defendants produced the RPI in response to Plaintiff Wilderness Watch's FOIA request submitted on February 3, 2025.

Therefore, Defendants waived deliberative process privilege for the RPI by producing it in
response to a public inquiry.

II.     **The Court should supplement the record with the O&M Plan and SUP in order to
        provide technical clarification of the project scope and to demonstrate that the
        Agency failed to consider all relevant information in rendering its decision.**

        While judicial review is typically limited to the complete administrative record, courts
may supplement the record with extra-record materials when (1) supplementation is necessary to
determine whether the agency considered all relevant factors and explained its decision; (2) the
agency has relied on documents not in the record; (3) supplementing the record is necessary to
explain technical terms or complex subject matter; or (4) the plaintiff makes a showing of agency
bad faith. Harrisonville Tel. Co. v. Illinois Commerce Comm'n, 472 F. Supp. 2d 1071, 1074
(S.D. Ill. 2006). Several of these factors apply in this case and call for supplementation of the
record with the O&M Plan and SUP attached hereto as Exhibits 2 and 3 respectively.

        The SUP and O&M Plan reveal a conflict in the scope of the project and accordingly, are
necessary to provide technical understanding of the size of the authorized roadway and its impact
on the Lusk Creek Wilderness. The Decision Memo (DM) and the RPI both analyzed and
authorized a 12-foot right-of-way, which they calculated at exactly 3.64 acres. However, the
O&M Plan mandates that "Horizontal clearing limits shall be 9 feet either side of the road
centerline." Ex. 2 at pp. 3, 11. An 18-foot clearing width over 13,200 feet (2.5 miles) results in
5.45 acres of disturbance – a significant (49.7%) increase in land that will be impacted by the
Project and is analyzed in the RPI. By omitting the O&M Plan, Defendants are effectively
suppressing evidence that the actual ground disturbance will be significantly greater than what
was scoped and authorized. This is certainly a "relevant factor" the Agency failed to study and
should be considered by this Court in evaluating Plaintiffs' claims. Highway J Citizens Grp. v.
Mineta, 349 F.3d 938, 952-53 (7th Cir. 2003).

These materials are also necessary to show that the Agency failed to consider all relevant factors in rendering its decision. The AR makes clear that the draft SUP "can't really be edited … it's canned/standard language populated by SUDS" and that the O&M was "patterned after a similar wilderness access permit on the Green Mountain NF in Vermont." LuskAR002000. This template-based approach to agency decision-making raises questions about whether Defendants performed the required site-specific "hard look" at the unique impacts of the project on the Lusk Creek Wilderness, or instead relied on generic language used in other projects and suggesting that the agency's decision was arbitrary and capricious under State Farm, 463 U.S. at 43. Further, these documents, although post-decisional, should be included in the record to properly examine whether the agency failed to consider all "relevant factors" (the actual footprint of the approved road). Mineta, 349 F.3d at 952-3.[3]

## CONCLUSION

The administrative record is incomplete without the RPI and the Archaeological Survey. The O&M Plan, and the SUP fit the circumstances for supplementation of the record. For these and the foregoing reasons, Plaintiffs respectfully request this Court to order completion and supplementation of the administrative record with the RPI, Archaeological Survey, O&M Plan and SUP.

---

[3] Lest Defendants attempt to argue to the contrary, Miami Nation confirms that postdecisional communications—such as the Feb 6, 2025 email and the O&M Plan and SUP which it transmitted—are not protected by the deliberative process privilege. Miami Nation of Indians of Ind., 979 F. Supp. at 777-78 (citing to U.S. v. Farley, 11 F.3d 1385, 1389 (7th Cir. 1993)).

Respectfully Submitted,

*/s/ Sarah Rubenstein*
Sarah Rubenstein (Illinois Bar No. 6244789)
Bruce Morrison (Illinois Bar No. 6279301)
Great Rivers Environmental Law Center
4625 Lindell Blvd., Suite 200
St. Louis, MO 63108
Tel: 314-231-4181
srubenstein@greatriverslaw.org
bamorrison@greatriverslaw.org

*/s/ Daniel Brister*
Daniel Brister (Montana Bar No. 64922907)
Wilderness Watch
P.O. Box 9175
Missoula, Montana 59807
Tel: 406-542-2048
danb@wildernesswatch.org
*Application for Admission Pro Hac Vice Pending*

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this 13th day of March, 2026, a true and correct

copy of the foregoing was filed electronically on PACER to be served by operation of the Court's

electronic filing system upon all parties of record.

*/s/ Sarah Rubenstein*

EXHIBIT 1

# Request For Project Input
**Proposed Action Preparation**

## Comments
**Due By 10/31/2024**

### Hidden Springs/Mississippi Bluffs Ranger Districts

Categorical Exclusion Review or
Preliminary Environmental Assessment Review

**Date Requested: 10/9/2024**
**Project Name: LCW Private Inholding Access Project**
**Type of Project: Road Permit**
**Interdisciplinary Team Leader: Dan Horton**
**Date of Presentation to NEPA Team: 10/9/2024**
**County or Counties: Pope County**

**Part 1a – Project Proposal** *(to be completed by project lead)*

**Background:** The Illinois Wilderness Act of 1990 created the Lusk Creek Wilderness, within which a 1-acre inholding and an 87-acre inholding exist. The inholdings are jointly owned by Ben and Patricia Effland, Larry Capps, Kevin Nelson, Nerissa Capps-Glasden, Jamette Morgan, Francis Pike, Travis Pike, Naomi Pike, Dave and Pamela Bramlet, Derrick and Rosalea Johnson, Robert and Elena Hamilton. Their year-round historic access has been by use of licensed full-size vehicles as well as Off-Highway Vehicles (ATV/Motorcycle aka OHV) using the Oak Blanchard access road (located next to New Liberty Church) for approximately 2.5 miles beginning at the current wilderness boundary. The private inholdings have cabins and associated infrastructure.

The landowners were contacted in 1990 informing them their access to the inholding was in and around a designated wilderness area and that the Forest Service would work with them to provide authorization for the most mutually desirable location and means for access to their property. A Letter of Authorization (LOA) was issued in 1988 granting some of the private landowner's permission to use Oak Blanchard Road to access their property.

**Proposed Action:**

The proposal is to provide access by motorized use year-round needed to fulfill ANILCA obligations for reasonable use and enjoyment of the land by the inholding owners and to support the historic use requested on the special use permit application by the inholding owners. This access would allow the owners to use mechanized equipment to repair about 2.5 miles of road utilizing segments of the historic route and segments of the user-created routes, and conduct periodic, routine maintenance for the upkeep of their access road. Inholders plan on building structures and upkeeping their property using tractors and full-sized

1

EXHIBIT 1

vehicles with trailers. The proposed road is approximately 2.5 miles long by 12 feet wide or 3.64 acres located in Township 11 S, Range 6 E, Sections 22, 23, 26, 27, 34, 35 Pope County, IL.

The electronic project files are located at:

- *LCW Private Inholding | Powered by Box*
- R9SHA1900/WorkingFiles/LCW Private Inholding

**Location of Proposed Action:** Township 11 S, Range 6 E, Sections 22, 23, 26, 27, 34, 35 Pope County, IL



Form Revised 9/01/2021 TAT
Form Revised 11/19/2021 TAT
Form Revised 8/09/2023 TAT

EXHIBIT 1

**Forest Plan Direction Review:** The proposed action is in conformance with the Forest Land Management Plan (2006) for the Shawnee National Forest. The proposed action is within the wilderness (WD) management area. A minimum requirement analysis (MRAF) has been completed to assess the minimum impact course of action for the project within the management area.

## Categorical Exclusion Review:

This proposed action may be categorically excluded from documentation in an EIS or EA because it fits the following category or categories, pending extraordinary circumstances determinations.

Applicable category or categories: **36 CFR 220.6(e)(3)**; Approval, modification, or continuation of special uses that requires less than 20 acres of NFS lands.

This category is applicable for this project because the proposed road is approximately 3.6 acres and represented under paragraph (v) of 36 CFR 220.6(e)(3) which states the approval of special uses for the installation of a driveway or other facilities incidental to the use of a private residence.

## Key Public Contacts To Be Made:

Ben and Patricia Effland, Larry Capps, Kevin Nelson, Nerissa Capps-Glasden, Jamette Morgan, Francis Pike, Travis Pike, Naomi Pike, Dave and Pamela Bramlet, Derrick and Rosalea Johnson, Robert and Elena Hamilton, Jeremy Nelson, Scott Wright, Leith Konyndyk

Addresses on file with the Shawnee National Forest to protect confidentiality.

## Implementation: Fall 2024/Winter 2025

**Ground disturbing activities:** Ground disturbing activities anticipated as a result of the proposed action(s)?
☒YES ☐NO

EXHIBIT 1

## Additional Project Information:

**Special Authorities:** (*select as applicable*)
- ☐ None
- ☐ FS Energy Implementation Plan
- ☐ Grazing, Rescissions Act
- ☐ NFP HFRA Title I
- ☐ NFP HFRA Title II
- ☐ NFP HFRA Title III
- ☐ NFP HFRA Title IV
- ☐ NFP Healthy Forests Initiative CE
- ☐ NFP Healthy Forests Initiative Demo E
- ☐ NFP Other
- ☐ Stewardship Contract

**Project Activities\*:** (select as applicable)
- ☐ Abandoned mine clean-up – ML
- ☐ Boundary adjustments - BL
- ☐ Developed site mgmt. - DS
- ☐ Directive creation/mod. - DC
- ☐ Dispersed rec. mgmt. - GA
- ☐ Environmental compliance - EC
- ☐ Facility improvement/const. - FI
- ☐ Facility maintenance - MF
- ☐ Forest veg. improvements - FV
- ☐ Fuel treatments
    (non-activity fuels) - FN
- ☐ Grazing allotment mgmt. - GP
- ☐ Grazing authorizations - GR
- ☐ Grazing structural
    improvements – SI

- ☐ Heritage resource mgmt. - HR
- ☐ Land exchanges - PJ
- ☐ Land purchases - LP
- ☐ Land use adjustments - AL
- ☐ Minerals/geology plans of operations - MO
- ☐ Noxious weed treatments - NW
- ☐ Order creation/mod. - OC
- ☐ Plan amendment - MP
- ☐ Plan creation/revision - CP
- ☐ Range veg. improvements - RV
- ☐ Regulation creation/mod. - RC
- ☐ Research - RE
- ☐ Road decommissioning - DR
- ☐ Road improvements/const. - RI
- ☐ Road maintenance - RD
- ☐ Roadless area mgmt. - RA
- ☐ Scenery mgmt. – SC
- ☐ Special area mgmt. - SA
- ☐ Special products sales - NC
- ☒ Special use authorizations - LA
- ☐ Species habitat improvements - HI
- ☐ Species pop. Enhancements - PE
- ☐ Timber sales (green) - TS
- ☐ Timber sales (salvage) - SS
- ☐ Trail mgmt. - MT
- ☐ Travel mgmt. - TR
- ☐ Watershed improvements - WC
- ☐ Wilderness mgmt. – WD

\*REMEMBER, when the decision is signed you will have to provide a metric (amount) based on the project activity you selected.

## Expected Decision Maker Title: (*select one*)
- ☐ District Ranger
- ☒ Forest Supervisor

**Project Scope:** (*select one*)  ☐ District level  /  ☒ Forestwide

**Overall NEPA Process Status:** (*select one*)
- ☐ Developing Proposal /  ☒  In Progress /  ☐  On Hold  /  ☐  Cancelled  /  ☐  Completed
  *'Developing Proposal' means that public scoping is expected to start within the SOPA period.*
  *'In Progress' means that public scoping has started.*
  *For an EIS the start of public scoping is denoted by publication of the NOI in the Federal Register.*

## Estimated Statuses:

**Estimated – Scoping start:** (*month/year*)    <u>11/1/2024</u>
(*Enter Estimated Decision unless project is 'On Hold' or 'Cancelled'.*)

**Estimated – Decision:** (*month/year*)    <u>11/22/2024</u>
(*Enter Estimated Implementation unless project is 'On Hold' or 'Cancelled'.*)

**Estimated – Implementation:** (*month/year*)    <u>2/22/2025</u>
(*Enter the following Estimated Statuses as applicable.*)

**Estimated – 36 CFR 215 comment period start:** (*optional, month/year*)  _____

**Estimated – 36 CFR 218 objection period start:** (*optional, month/year*)  _____

**Estimated – DEIS NOA in Federal Register:** (*optional, month/year*)  _____

**Estimated – FEIS NOA in Federal Register:** (*optional, month/year*)  _____

Form Revised 9/01/2021 TAT
Form Revised 11/19/2021 TAT
Form Revised 8/09/2023 TAT

EXHIBIT 1

**Part 1b – Project Directions** *(to be completed by the District Ranger)*

## Directions to the team lead:
**Scope the following:**
☐ Adjacent property owners/affected parties or individuals
☒ Interested parties (All Decisions List)
☐ Project mailing list (if list exists and or prepare project mailing list)
☒ Other(s) Ben and Patricia Effland, Larry Capps, Kevin Nelson, Nerissa Capps-Glasden, Jamette Morgan, Francis Pike, Travis Pike, Naomi Pike, Dave and Pamela Bramlet, Derrick and Rosalea Johnson, Robert and Elena Hamilton, Jeremy Nelson, Scott Wright, Leith Konyndyk
☒ Internal (indicate what resources below in 'Directions to resource specialists' section)

**If scoping externally, scope with a scoping notice:**
☒ Yes
☐ No

**Scope in:**
☐ The Shawnee Quarterly (scoping period will be 21 days from publication of the Quarterly)
    ☐ January  /  ☐ April  /  ☐ July  /  ☐ October
☒ Other – Scoping in November 2024 for 21 days.

**This project is to be documented with a:**
☒ DM & RPI (Parts 1, 2 and 3) that completely and appropriately contain the needed information
☐ LTF & RPI (Parts 1, 2 and 3) that completely and appropriately contain the needed information
☐ RPI/LTF (Parts 1, 2 and 3) that completely and appropriately contain the needed information (RPI suffices as LTF)

## Directions to resource specialists:
**The following resources are being <u>scoped</u> internally. Resource specialists are to complete Part 2 of this RPI.**

| | |
|---|---|
| ☒ Recreation/Wilderness/Visual | ☐ Law Enforcement/Public Safety |
| ☒ Cultural/Heritage | ☒ Engineering/Roads/Facilities |
| ☒ Wildlife | ☒ Fire/Fuels |
| ☒ Botany | ☒ Timber/Silviculture |
| ☒ Water/Soils | |

**The following resources <u>must</u> answer the questions regarding extraordinary circumstances in Part 2 of the RPI** *(all five boxes below <u>must</u> always be selected / x'ed)***.**
☒ Wilderness
☒ Cultural/Heritage
☒ Wildlife
☒ Botany
☒ Water/Soils

Form Revised 9/01/2021 TAT
Form Revised 11/19/2021 TAT
Form Revised 8/09/2023 TAT

EXHIBIT 1

**PART 2 – Preliminary Internal Review and Issue Identification** *(to be completed by district staff)*

## Recreation / Wilderness / Visual Resources

| X | The proposal would not adversely affect unique geographic characteristics such as park, recreation, or refuge lands, wilderness areas, wilderness study area, wild and scenic rivers including those listed on the Department's National Register of Natural Landmarks. |

*(Identify the areas that would be affected if any: If areas will be affect are there mitigation measures or design feature to reduce or eliminate impacts?)*

**Are there extraordinary circumstances related to this proposed action for this resource?**
*'X' Yes or No*

| Yes | No | |
|-----|-----|---|
| X | | Do Congressionally designated areas, such as wilderness, wilderness study areas, or national recreation areas occur within the project area? |
| | X | Do inventoried roadless areas occur within the project area? |

| If yes, |
|---|
| • Specify special management area present. |
| • Is there a cause-effect relationship between the proposed action and the potential effect on this or these resource conditions? |
| • What is the degree of potential effect on this or these resources? |
| • Does the degree of potential effect raise uncertainty over its significance? |
| • Briefly explain in 'Comments' below. |

✓ List any key public contacts that need to be made on page 2
✓ Attach any additional information pertaining to this proposal
✓ List requested funding needed to support this proposal
✓ Complete environmental analysis to include review of proposal to determine compliance and or consistency with the Forest Plan and any/all applicable laws, regulations and policies associated with this/these resource area.
✓ Complete wilderness, etc. bullet (third bullet) under 'Resource Conditions' at end of PART 2
✓ Complete inventoried roadless area/potential wilderness areas bullet (fourth bullet) under 'Resource Conditions' at end of PART 2

☒ **Section is complete**

**Recreation Specialists: Kyle Varel**                    **Date: 10/25/2024**

Comments:  A Minimum Requirements Analysis (MRA) was conducted to identify and address effects associated with providing access to private property through Lusk Creek Wilderness. Specialists used the Minimum Requirements Analysis Framework (MRAF), a decision-making guide consistent with FS policy, to evaluate alternatives and how the effects of those alternatives would impact wilderness characteristics.  Alternative #3 (of 3) was selected as being least impactful to wilderness character:

"This alternative includes providing motorized access to the private landowners along a redefined route that would combine segments of both the historic road and user-created roads to avoid sensitive areas and reduce natural resource impacts. Providing and delineating a more sustainable route would lessen or eliminate damage from future flooding events and reduce potential impacts to the riparian and aquatic habitat resources that are currently being impacted. This alternative would require the repair of about 2.5 miles of road utilizing segments of the historic route and segments of the user-created routes. Restoration of non-utilized historic and user-created road segments should be done at the same time the redefined road is designated to minimize the impact on the untrammeled, undeveloped, natural, primitive and unconfined wilderness characters."

**MRA Link**

Form Revised 9/01/2021 TAT
Form Revised 11/19/2021 TAT
Form Revised 8/09/2023 TAT

EXHIBIT 1

**PART 2 – Preliminary Internal Review and Issue Identification** *(to be completed by district staff)*

## Cultural / Historical

_____ The proposal has no potential to disturb the ground or damage features or structures (Memo required for project file)
*Memo can be completed by (give earliest date):*  Click here to enter a date.
___X_____ The project area has been inventoried for cultural resources and no sites were found (Archaeological report required)
_____ Project design can avoid or protect any known/suspected sites; project needs survey (Archaeological report required)
_____ The proposal does not threaten to violate a federal, state, local or tribal law or requirement imposed for the protection of the environment.
_____ The proposal would not adversely affect properties listed or eligible for listing in the National Register of Historic Places.

☒YES  ☐NO     **SHPO consultation is required**          ☒YES  ☐NO     **THPO consultation is required**
If yes indicate:                                          If yes indicate:
Letter was sent to SHPO on **10/24/2024**                 Letter was sent to THPOs on **10/24/2024**
☒ The email/letter sent to SHPO is in the project folder  ☒ The email/letter sent to THPOs is in the project folder
Signed SHPO concurrence was received on **11/6/2024**      Signed THPOs concurrence was received on **11/19/2024**
☒ The email/letter received from SHPO is in the project    ☒ The email/letter received from THPOs is in the project
folder                                                     folder

**Are there extraordinary circumstances related to this proposed action for this resource?**
*'X' Yes or No*

| Yes | No | |
|-----|-----|-----|
| | X | Do American Indians and Alaska Native religious or cultural sites occur within the project area? |
| | X | Do archaeological sites, or historic properties or areas occur within the project area? |

If yes,
- Is there a cause-effect relationship between the proposed action and the potential effect on this or these resource conditions?
- What is the degree of potential effect to these resources?
- Does the degree of potential effect raise uncertainty over its significance?
- Briefly explain in 'Comments' below.

*NOTE:  Appropriate consultation with Native American tribes is always required under NHPA and ARPA as amended*
✓ List any key public contacts that need to be made on page 2
✓ Attach any additional information to this document pertaining to this proposal
✓ List requested funding needed to support this proposal
✓ Complete environmental analysis to include review of proposal to determine compliance and or consistency with the Forest Plan and any/all applicable laws, regulations and policies associated with this/these resource area.
✓ Complete religious and cultural sites bullet (sixth bullet) under 'Resource Conditions' at end of PART 2
✓ Complete archaeological sites or historic properties bullets (seventh bullet) under 'Resource Conditions' at end of PART 2

☒ **Section is complete**

**Archaeologist/Heritage Specialist:** Heather Carey                    **Date: 10/24/2024**

Comments: No historic properties are present within the APE.

EXHIBIT 1

**PART 2 – Preliminary Internal Review and Issue Identification** *(to be completed by district staff)*

## Wildlife / Fish / Threatened, Endangered, Proposed Animal Species

   X   1. No TEP species involved *(go to #4)*
_____2. TEP Species involved but No Effect expected *(go to #4)*
_____3. TEP involved USFWS consultation expected *(complete 3a – 3f and #4)*
          a. Document full analysis of all alternatives and all species for project file; this includes threatened, endangered and proposed species, sensitive species, management indicator species and special interest species.
          b. If something can't be mitigated – analyze as an issue in EA
          c. Write BA for the preferred alternative
          d. Submit BA on preferred alternative to the USFWS
          e. Expect concurrence/denial within 30 days
          f. Circulate BA for USFS signatures
   X   4. No sensitive species involved.
_____5. Sensitive species involved, no impact expected
_____6. Sensitive species involved, impact expected.
          a. <u>BA/BE Needed</u>.


☐ **YES**    ☒ **NO**          **USFWS consultation is required**

If yes indicate:
BA was sent to USFWS on <u>Click here to enter a date.</u>
☐ The email/letter sent to USFWS is in the project folder
Signed USFWS concurrence was received on <u>Click here to enter a date.</u>
☐ The email/letter received from USFWS is in the project folder


**Are there extraordinary circumstances related to this proposed action for this resource?**
*'X' Yes or No*

| Yes | No | Unknown | |
|-----|-----|---------|---|
| | | X | Do Federally listed threatened or endangered species occur within the project area? |
| | X | | Does designated critical habitat occur within the project area? |
| | | X | Do Forest Service sensitive species occur within the project area? |

If yes,
- Specify species present.
- Is there a cause-effect relationship between the proposed action and the potential effect on this or these species?
- What is the degree of potential effect to this or these species?
- Does the degree of potential effect raise uncertainty over its significance?
- Briefly explain in 'Comments' below.


✓ List any key public contacts that need to be made on page 2
✓ Attach any additional information to this document pertaining to this proposal
✓ List requested funding needed to support this proposal
✓ Complete environmental analysis to include review of proposal to determine compliance and or consistency with the Forest Plan and any/all applicable laws, regulations and policies associated with this/these resource area.
✓ Complete Federally listed/endangered, sensitive species bullet (first bullet) relevant to wildlife under 'Resource Conditions' at end of PART 2

☒ **Section is complete**

**Wildlife Biologist:** Mark Vukovich                          **Date: 11/4/2024**


**Comments:** No bat mist-net surveys have occurred in the area for federally-listed species. One known record occurs within the Lusk Creek Wilderness for an eastern small-footed bat, a state endangered species, but it is not near the inholding or road.

EXHIBIT 1

Page 81 of SNF Forest Plan Biological Opinion

Special use permits are issued for existing right-of-ways for road repair and maintenance of utilities. Few, if any, trees would be impacted by the issuance of special-use-permits for maintenance. In a few instances, new road right-of-ways across the Forest may need to be cleared of hardwood trees. However, with the application of Indiana bat standards and guidelines and given the small increment of forested habitat impacted, these activities are not likely to result in adverse fitness consequences for Indiana bats. The potential indirect effects associated with issuing new right-of-way permits cannot be assessed at this stage due to the uncertainty of the kinds of actions that may occur.

If any trees need to be removed between 1 April through 15 November, the trees must be checked by a biologist to confirm non-use by listed bats.

Form Revised 9/01/2021 TAT
Form Revised 11/19/2021 TAT
Form Revised 8/09/2023 TAT

EXHIBIT 1

**PART 2 – Preliminary Internal Review and Issue Identification** *(to be completed by district staff)*

## Botany – Threatened, Endangered, Proposed Plant Species

X_____  1.  No TEP species involved *(go to #4)*

_____  2.  TEP Species involved but No Effect expected *(go to #4)*

_____  3.  TEP involved USFWS consultation expected *(complete 3a – 3f and #4)*

         a.  Document full analysis of all alternatives and all species for project file; this includes threatened, endangered and proposed species, sensitive species, management indicator species and special interest species.

         b.  If something can't be mitigated – analyze as an issue in EA

         c.  Write BA for the preferred alternative

         d.  Submit BA on preferred alternative to the USFWS

         e.  Expect concurrence/denial within 30 days

         f.  Circulate BA for USFS signatures

X_____  4.  No sensitive species involved.

_____  5.  Sensitive species involved, no impact expected

_____  6.  Sensitive species involved, impact expected.

         a.  BA/BE Needed.

X_____  7.  No new ground disturbing activities associated with this proposed project.

☐YES  ☒NO  **USFWS consultation is required**

If yes indicate:

BA was sent to USFWS on <u>Click here to enter a date.</u>

☐ The email/letter sent to USFWS is in the project folder

Signed USFWS concurrence was received on <u>Click here to enter a date.</u>

☐ The email/letter received from USFWS is in the project folder

☐YES  ☒NO  **NRS consultation is required**

If yes indicate:

Letter was sent to NRS on <u>Click here to enter a date.</u>

☐ The email/letter sent to NRS is in the project folder

Signed NRS concurrence was received on <u>Click here to enter a date.</u>

☐ The email/letter received from NRS is in the project folder

**Are there extraordinary circumstances related to this proposed action for this resource?**

*'X' Yes or No*

| Yes | No | None known at this time | |
|---|---|---|---|
| | X | | Do Federally listed threatened or endangered species occur within the project area? |
| | X | | Does designated critical habitat occur within the project area? |
| | | X | Do Forest Service sensitive species occur within the project area? |
| | X | | Do research natural areas occur within the project area? |

If yes,
- Specify resource conditions present.
- Is there a cause-effect relationship between the proposed action and the potential effect on this or these species?
- Is there a cause-effect relationship between the proposed action and the research natural area present?
- What is the degree of potential effect to this area?
- Does the degree of potential effect raise uncertainty over its significance?
- Briefly explain in 'Comments' below.

   ✓  List any key public contacts that need to be made on page 2

   ✓  Attach any additional information to this document pertaining to this proposal

   ✓  List requested funding needed to support this proposal

   ✓  Complete environmental analysis to include review of proposal to determine compliance and or consistency with the Forest Plan and any/all applicable laws, regulations and policies associated with this/these resource area.

   ✓  Complete Federally listed/endangered, sensitive species bullet (first bullet) relevant to plants under '<u>Resource Conditions</u>' at end of PART 2

   ✓  Complete Research Natural Area bullet (fifth bullet) under '<u>Resource Conditions</u>' at end of PART 2

☒ **Section is complete**

EXHIBIT 1

| | |
|---|---|
| **Botanist:** Clarice Esch | **Date: 10/9/2024** |

**Comments:** The proposed access route, including restoration areas and lead off ditches, was botanically surveyed on 9/5/2024 by Clarice Esch & Nick Seaton. No state-listed, RFSS, or SVE plants were encountered.

Any equipment used in this project should be weed washed prior to entering and leaving the site to reduce spread of any non-native invasive species.

Form Revised 9/01/2021 TAT
Form Revised 11/19/2021 TAT
Form Revised 8/09/2023 TAT

EXHIBIT 1

## PART 2 – Preliminary Internal Review and Issue Identification *(to be completed by district staff)*

### Water / Soils

_____ The proposed project is not within sole or principal drinking water aquifers, prime farmlands, wetlands, floodplains, or ecologically significant or critical areas.

_____ The proposal would not require compliance with Executive Order 11988 (Floodplain Management) 11990 (Protection of Wetlands). (*Identify the law and effect if any*)

_____ No new ground disturbing activities associated with this proposed project.

**Are there extraordinary circumstances related to this proposed action for this resource?**
*'X' Yes or No*

| Yes | No | |
|-----|-----|---|
| x | | Do floodplains occur within the project area? |
| | x | Do wetlands occur within the project area? |
| | x | Do municipal watersheds occur within the project area? |
| If yes,  •  Is there a cause-effect relationship between the proposed action and the potential effect on this or these resource conditions?  •  What is the degree of potential effect this or these resources?  •  Does the degree of potential effect raise uncertainty over its significance?  •  Briefly explain in 'Comments' below. | | |

✓ List any key public contacts that need to be made on page 2
✓ Attach any additional information to this document pertaining to this proposal
✓ List requested funding needed to support this proposal
✓ Complete environmental analysis to include review of proposal to determine compliance and or consistency with the Forest Plan and any/all applicable laws, regulations and policies associated with this/these resource area.
✓ Complete floodplains, wetlands, or municipal watersheds bullet (second bullet) under 'Resource Conditions' at end of PART 2

☒ **Section is complete**

**Hydrologist and/or Soil Scientist:** Margaret Anderson                    **Date: 10/21/2024**

Comments: There are no wetlands or municipal watersheds present. There are prime farmlands present, however there will be no conversion out of cropland. There are no hydric soils present, however there are two potential soil flood zones located at two cross sections. There is one intermittent stream that ends close to the proposed action (see map). A perched water table could be present.

Suitability for roads on natural surfaces vary from poorly suited to moderately suited (See WSS soil report). One or more soil properties are less than desirable, and fair performance can be expected. Some maintenance will be needed. Hazard of erosion on roads and trails are moderate to severe.

This action provides motorized access to the private landowners that would combine segments of both the historic road and user-created roads that would reduce impacts to the soil and water.

Reference:
United States Department of Agriculture, Natural Resources Conservation Service, National forestry manual.

EXHIBIT 1

**PART 2 – Preliminary Internal Review and Issue Identification** *(to be completed by district staff)*

**Law Enforcement / Public Safety**

_____The proposal would have no significant adverse effects on public health or safety.

- ✓ List any key public contacts that need to be made on page 2
- ✓ Attach any additional information to this document pertaining to this proposal
- ✓ List requested funding needed to support this proposal

☐ **Section is complete**

| | |
|---|---|
| **Law Enforcement Officer:** | **Date:** Click here to enter a date. |

**Comments: NA**

Form Revised 9/01/2021 TAT
Form Revised 11/19/2021 TAT
Form Revised 8/09/2023 TAT

EXHIBIT 1

**PART 2 – Preliminary Internal Review and Issue Identification** *(to be completed by district staff)*

### Engineering/Roads/Facilities

---

| _____ | No Concerns |

\_\_\_\_\_X\_\_\_ The proposal requires design specifications or input – roads, trails, bridges, facilities, utility systems (*write specifics below*)

- ✓ List any key public contacts that need to be made on page 2
- ✓ Attach any additional information to this document pertaining to this proposal
- ✓ List requested funding needed to support this proposal
- ✓ Complete environmental analysis to include review of proposal to determine compliance and or consistency with the Forest Plan and any/all applicable laws, regulations and policies associated with this/these resource area.

☒ **Section is complete**

**Engineer:  Austin Henk**                                 **Date: 10/22/2024**

---

## Comments:

The proposal requires road design input. This input can be found in the PointbyPointDescription.xlsx and the 2525-LuskCreekInholdingEngPtsTopo.pdf attachments.

EXHIBIT 1

**PART 2 – Preliminary Internal Review and Issue Identification** *(to be completed by district staff)*

### Fire/Fuels

____X__ No Concerns

_____ The proposal requires fuels specialist input.  (Described in below in Comments Section)

- ✓  List any key public contacts that need to be made on page 2
- ✓  Attach any additional information to this document pertaining to this proposal
- ✓  List requested funding needed to support this proposal
- ✓  Complete environmental analysis to include review of proposal to determine compliance and or consistency with the Forest Plan and any/all applicable laws, regulations and policies associated with this/these resource area.

⊠ **Section is complete**

**Fuels Specialist: Jesse Riechman**                                      **Date: 11/19/2024**

1)  **Comments:** The proposed actions are not expected to significantly change the forest fuels or increase fire risk. It is recommended that any excess activity fuels created during the project be distributed away from the road, should it be used for a fire break in the future. For the same reason, workers and equipment should adhere to standard weed washing practices to limit the establishment of invasive hazardous fuels in the proposed project area.

Form Revised 9/01/2021 TAT
Form Revised 11/19/2021 TAT
Form Revised 8/09/2023 TAT

EXHIBIT 1

**PART 2 – Preliminary Internal Review and Issue Identification** *(to be completed by district staff)*

## Timber/Silviculture

____X___  No Concerns

_____  The proposal requires merchantable tree removal.  (Described in below in Comments Section)

- ✓  List any cruise information and appraisal results
- ✓  Attach any additional information to this document pertaining to this proposal
- ✓  List requested funding needed to support this proposal
- ✓  Complete environmental analysis to include review of proposal to determine compliance and or consistency with the Forest Plan and any/all applicable laws, regulations and policies associated with this/these resource area.

☒ **Section is complete**

**Timber/Silviculture Specialist:** Anastacia Hanauer                          **Date:** 10/31/2024

**Comments: None**

Form Revised 9/01/2021 TAT
Form Revised 11/19/2021 TAT
Form Revised 8/09/2023 TAT

**PART 2 – Preliminary Internal Review and Issue Identification** *(to be completed by district staff)*

**Resource Conditions** considered in determining whether extraordinary circumstances might exist related to a proposed action that might warrant further analysis in an EA or EIS:

- Federally listed threatened or endangered species or designated critical habitat, species proposed for Federal listing or proposed critical habitat, or Forest Service sensitive species – One known record occurs within the Lusk Creek Wilderness for an eastern small-footed bat, a state endangered species, but it is not near the inholding or road. If any trees need to be removed between 1 April through 15 November, the trees must be checked by a biologist to confirm non-use by listed bats.

- Flood plains, wetlands, or municipal watersheds – There are no wetlands or municipal watersheds present. There are flood plains present in two areas in the proposed action. The proposed action will reduce impacts to the soil and water and will incorporate best management practices including proper drainage to minimize impact.

- Congressionally designated areas such as wilderness, wilderness study areas, or national recreation areas – Project is within the Lusk Creek Wilderness. Minimum Requirements Analysis was completed to determine the plan of action that would cause the least amount of negative effect on the Wilderness area, based on the historic use of the roads over the past 30 years.

- Inventoried roadless areas or potential wilderness areas – None are present.

- Research natural areas – None are present

- American Indians and Alaska Native religious or cultural sites – None are present.

- Archaeological sites, or historic properties or areas – None are present.

**Note**: The mere presence of one or more of these resource conditions does not preclude use of a CE. It is the existence of a cause-effect relationship between a proposed action and the potential effect on these resource conditions and, if such a relationship exists, the degree of the potential effect of a proposed action on these resource conditions that determine whether extraordinary circumstances exist (36 CFR 220.6[b]).

*Be sure to provide resource background and rationale. Is there something unique to this proposal or existing resource conditions that would lead to greater degree of effects than would typically be anticipated for similar actions?*

The proposed access will have some scrutiny over activities permitted in a Wilderness Area. The mere presence of wilderness does not preclude the need for allowing access to the property in-holders based on those criteria alone. There was pre-existing access prior to the area being wilderness. The analysis conducted by the agency was used to determine any potential effects on the resources. Allowing a Special Use Permit to the in-holders will allow the upkeep of the road and minimize erosion and sediment movement within the wilderness. The permits will also allow the agency to minimize the unauthorized and illegal ATV/UTV activities occurring in the area detracting from the wilderness experience by visitors. The MRAF describes the alternatives and the least impactful alternative to the wilderness management area.

Form Revised 9/01/2021 TAT
Form Revised 11/19/2021 TAT
Form Revised 8/09/2023 TAT

EXHIBIT 1

**PART 3a – Scoping Summary** *(to be completed by project lead)*

This project was scoped ☐ Internally  ☒ Externally

---

☒ If scoped externally and scoping distributed electronically by a NEPA specialists *(to be completed by NEPA specialist)*:

- The following individuals, organizations or entities were scoped:

Ben and Patricia Effland, Larry Capps, Kevin Nelson, Nerissa Capps-Glasden, Jamette Morgan, Francis Pike, Travis Pike, Naomi Pike, Dave and Pamela Bramlet, Derrick and Rosalea Johnson, Robert and Elena Hamilton, Jeremy Nelson, Scott Wright, Leith Konyndyk

- Scoping began on **11/1/2024** and ended on **11/22/2024**.

☒ **Section is complete**
**NEPA Specialist:** Kamden Summers   **Date:** 11/23/2024

---

☒ If scoped externally and scoping distributed by project lead *(to be completed by project lead)*:

- The following individuals, organizations or entities were scoped:

Ben and Patricia Effland, Larry Capps, Kevin Nelson, Nerissa Capps-Glasden, Jamette Morgan, Francis Pike, Travis Pike, Naomi Pike, Dave and Pamela Bramlet, Derrick and Rosalea Johnson, Robert and Elena Hamilton, Jeremy Nelson, Scott Wright, Leith Konyndyk

- Scoping began on **11/1/2024** and ended on **11/22/2024**.

---

Scoping (external) comments were received ☒ YES   ☐ NO
If yes:
- Scoping comments are filed in the project folder at:

  *LCW Private Inholding | Powered by Box*
  R9SHA1900\WorkingFiles\LCW Private Inholding Access\Email Record\Response to Comments

- Indicate who commented and summarize comment(s).


- Indicate how comment(s) were considered.


- Indicate any pertinent situations that were brought up during scoping for consideration and why they do not constitute extraordinary circumstances to the seven resource conditions.


**PART 3b – Consultation Summary** *(to be completed by project lead)*

- U.S. FWS consultation was necessary and required ☐ YES   ☒ NO

  If yes, concurrence has been received ☐ YES   ☐ NO.  Consultation and concurrence correspondence are filed in the project folder at: NA

- SHPO consultation was necessary and required ☒ YES   ☐ NO

  If yes, concurrence has been received ☒ YES   ☐ NO.  Consultation and concurrence correspondence are filed in the project folder at: *LCW Private Inholding | Powered by Box*

EXHIBIT 1

- THPO consultation was necessary and required ☒YES    ☐NO

  If yes, concurrence has been received ☒YES    ☐NO.  Consultation and concurrence correspondence are filed in the project folder at: _LCW Private Inholding | Powered by Box_

- NRS consultation was necessary and required ☐YES    ☒NO

  If yes, concurrence has been received ☐YES    ☐NO.  Consultation and concurrence correspondence are filed in the project folder at: NA

EXHIBIT 1

## PART 3c – Preliminary Decision (Responsible official to complete the following)

☐YES  ☒NO    This proposal would have *significant and controversial* environmental effects

☐YES  ☒NO    *Extraordinary circumstances* are found associated with this project

☐YES  ☒NO    The proposal is *directly related to other actions* which are individually insignificant, but cumulatively have significant effects

☐YES  ☒NO    The proposal would have *highly uncertain or potentially significant environmental effects* and involves unique or unknown environmental risks

☐YES  ☒NO    The proposal would *establish a precedent* for future action(s) or represents a decision in principle about a future consideration with potentially significant environmental effects

☐YES  ☒NO    This completed RPI (Parts 1, 2 and 3) documents that extraordinary circumstances were considered for the seven resource conditions and serves as a letter/memo to file.

☒YES  ☐NO    *Proceed with the development of a Decision Memo for line officer signature

☐YES  ☒NO    **This proposal, as stated, requires further analysis and an environmental assessment is required

**Date: 1/21/2025**

1/21/2025

X  Dennis B. Wilson
_____
Dennis Wilson
District Ranger
Signed by: DENNIS WILSON

**\*Reviewed/Approved By:**

***\*If this project will require a decision memo, return this document to the project leader listed on page 1 for development of a project record and skip Part 4.***

***\*\*If this project will require a decision notice complete Part 4 and return this document to the project leader for development of a project record.***

## PART 4 – Interdisciplinary Team Members and Timelines

IDT LEADER:__Click here to enter Name._____     IDT MEMBER:__Click here to enter Name._____

IDT MEMBER:__Click here to enter Name._____     IDT MEMBER:__Click here to enter Name._____

IDT MEMBER:__Click here to enter Name._____     IDT MEMBER:__Click here to enter Name._____

The proposal has been reviewed to determine if any of the exceptions described in 36 CFR 220.6 and FSH 1909.15, Chapter 30.

**SPECIAL-USE PERMIT, VIE202509**
**OPERATION AND MAINTENANCE PLAN**

**Robert Hamilton**
**Private Road Special-Use Permit**

**Shawnee National Forest**
**Hidden Springs Ranger District**

This operation and maintenance plan and its appendices are attached to and made a part of the Private Road Special-Use Permit VIE202509, effective on the execution of the Authorized Officer's signature, and issued to **Robert Hamilton,** (b) (6) ███████████████ (Holder/permittee). This plan does not supersede or nullify any clauses of the permit. It explains the general requirements to adequately provide for public service, health and safety. It defines required actions by the Holder and emphasizes the high degree of coordination and cooperation necessary to satisfactorily fulfill these responsibilities. The conditions of this operation and maintenance plan apply for all areas of operation as shown on the permit.

When signed by both the Special-Use Permit Holder and the Forest Service Authorized Officer, this operating plan becomes part of the permit. This plan is the key basis upon which the Holder's performance will be evaluated annually. The Authorized Officer must approve in advance any changes to the operating plan.

Permit Holder(s) _____ Date: _____
                     Robert Hamilton
                     (Holder)

Plan approved by _____ Date: _____
                     Felipe Cano
                     Forest Supervisor
                     (Authorized Officer)

EXHIBIT 2

*Special-Use Permit, VIE202509- Operation and Maintenance Plan*

I.  **PERIOD, DESCRIPTION, AND AREA OF OPERATION:** This Operation and Maintenance Plan pertains to the activities authorized in Special-Use Permit VIE202509 and is part of the permit. It is effective on the date of the executed permit and expires December 31st, 2034. The permit authorizes the continued use and maintenance of a 13,200 feet long by 12-feet wide, or 3.64-acre, right-of-way across National Forest System land for ingress and egress to private property. The right-of-way is located at Township 11 South, Range 6 East, Sections 22, 23, 26, 27, 34, and 35 Pope County, IL.

II.  **FOREST SERVICE/HOLDER MEETING:**  In an effort to enhance communication and working relations, a designated Forest Service representative and the Holder will schedule dates and times to meet during the period of operation. Periodic evaluations will be made by the Forest Service and provided to the Holder.  This evaluation will include information on how the permittee is performing in all areas of the permit.

III.  **PUBLIC OPERATION AND HEALTH AND SAFETY**

    **A. REFUSE DISPOSAL:** All trash will be removed from National Forest System land resulting from this use, burying of garbage is prohibited.

    **B. WATER POLLUTION:** No waste or by-product shall be discharged into water if it contains any substance in concentration, which will result in harm to fish and wildlife or to human water supplies

IV.  **RESOURCE PROTECTION:** The following restrictions will apply during road maintenance and/or repair activities -

    **A. NOXIOUS WEEDS:**  All equipment and tools to be used for maintenance or repair of the road corridor are to be cleaned of soil and potential noxious weed seeds and plant parts prior to being brought onto National Forest System lands. The purpose of this measure is to reduce the risk of introducing noxious weed seeds or plant parts to the disturbed area, especially after working in places where non-native invasive (exotic) plants (e.g., garlic mustard, Chinese yam) are known to occur.

    **B. SOIL DISTURBANCE:** Areas of soil disturbed during maintenance or repair will be promptly re-vegetated through application of a seed mix specified for the site type by the Shawnee National Forest Seeding Guide.  Please contact the authorized Forest Service officer or their designated representative to obtain a current version of the Seeding Guide prior to commencing any seeding operations. Any seed mix used after maintenance or repair activities will use seed that is certified as "Prohibited and Restricted Noxious Weed Free for the State of Illinois." To prevent sediment from entering streams following soil disturbance, sediment fences or straw bales will be placed between the area of soil disturbance and any stream or watercourse nearby.  If straw is used it can later be used to mulch bare soil areas following installation and seeding. Following soil disturbance, proper seedbed preparation is important. The site shall be tilled two to four inches depth of loose friable soil.  An equivalent of 3 ton/acre of agricultural lime along with 250 lbs of 33-0-0 (or equivalent) and 500 lbs/acre of 6-24-24 (or equivalent) will be applied to the road corridor where soil is disturbed. Rutted areas must be leveled, seeded and mulched. Mulch can be straw or wood chips in combination with seeding immediately following soil exposure to reduce soil erosion.

    **C. HERBICIDES:** Herbicide use on National Forest System land is prohibited unless determined necessary by a Forest Botanist to control existing or future spread of non-native invasive species (NNIS).

**D. INDIANA BATS:** Follow current 2006 Forest Plan standards and guidelines concerning protection of Indiana bats and other bat species.

<u>**NO timber harvesting activities from April 1st to November 15th and no trees (live or dead, standing or leaning, hardwood or conifer) greater than 4" dbh can be cut without prior approval from the Shawnee National Forest.**</u>

**E. TIMBER RATTLESNAKES:** Timber rattlesnakes are protected species in Illinois and must not be harmed, harassed, injured, handled, captured, or killed.

**F. PROTECTION OF HERITAGE RESOURCES:** Heritage and archaeological resources are any structural, architectural, artifactual or material remains of past human life or activities which are of historical or archaeological interest and are at least 50 years of age. All Heritage Resources, including archaeological sites, are protected on National Forest System land by a number of federal laws, including:

- ✓ the Antiquities Act of 1906,
- ✓ The Archaeological Resources Protection Act of 1979 (ARPA), and
- ✓ the Secretary of Agriculture's Regulations.

Under ARPA, it is a felony to disturb, alter, remove, or damage archaeological sites and objects that are over 100 years old on Federal lands. However, archaeological sites and artifacts are-also protected by 36 Code of Federal Regulations (CFR) 261.9 (g): Digging in, excavating, disturbing, injuring, destroying, or in any way damaging prehistoric, historic, or archaeological resources, structure, site, artifact, property; and 36 CFR 261.0 (h): Removing any prehistoric, historic, or archaeological resource structure, site, artifact, property.

Please leave archaeological sites and artifacts undisturbed and report any looters or evidence of looting activity that you see to the nearest Forest Service Office.

## V.   ROAD MAINTENANCE – See Appendices A-F for additional information

I.   SCOPE OF WORK: Work shall be to provide a road base and surface suitable for accessing private property. Work will include preparing the road base and periodic maintenance to establish a functional travel way. This work will establish a roadbed that may be traveled during all weather.

II.   SCHEDULE OF WORK: For this work the Designated Official is the District Ranger or their representative as designated in writing.

   A.   Phases 1 and 2 Maintenance: This work shall commence prior to accessing the property by high clearance vehicle for the first time.
     1.   Notify the District Ranger or its staff a minimum of 48 hours in advance of any work commencing.
     2.   No deviations from the original traveled way on the ground shall be made without prior approval in writing from the District Ranger prior to work commencing.
       a.   Horizontal clearing limits shall be 9 feet either side of the road centerline.
       b.   Vertical clearing limits shall be a minimum of 14 feet above the road surface.

EXHIBIT 2

3. Use a small dozer with articulating blade, motor grader or similar piece of equipment to scarify and shape the road surface by removing potholes and wheel ruts and to establish a minimum 2% cross slope to drain.
4. The maximum width of traveled way at any point shall be 12 feet.
5. Construct ditches and lead-off ditches as identified to direct water away from the road surface to provide drainage and prevent ponding.
6. Contact the District Ranger or his staff prior to placing rock.
   a. All aggregate and riprap used shall meet the gradations of Illinois Department of Transportation grades as specified herein or in Appendix B.
   b. Minimum compacted depth of aggregate shall be as shown on the attached Appendices. Compaction shall be obtained by operating the hauling and grading equipment over the roadway.
   c. Aggregate weigh tickets from the quarry shall be provided to the government to confirm gradation and quantity placed.
7. Downed limbs shall be removed from the traveled way; downed trees shall be cut a minimum of 3 feet ON either side of the road measured from the edge of road surface.
8. All brush, limb, and downed tree debris shall be scattered a minimum of 3 feet from the edge of road and placed so as not to block drainage.

B. Reoccurring Maintenance:
1. Maintenance of the roadway shall occur when potholes and wheel ruts deeper than 4 inches occur.
2. Minimum maintenance shall include blading and scarifying all potholes and wheel ruts from the road surface, leaving the road with a minimum 2% cross slope to drain. Aggregate drainages shall be reinforced as needed to maintain the road drainage.
3. Brushing shall occur as needed for vertical and horizontal clearance.
   a. Minimum vertical clearance shall be 14 feet above road surface.
   b. Maximum horizontal clearance shall be 3 feet either side of the road measured from the edge of the road surface. No trees larger than 4 inches in diameter at 4'6" above ground shall be removed.
4. Downed limbs shall be removed from the traveled way; downed trees shall be cut a minimum of 3 feet either side of the road measured from the edge of road surface.

**MISCELLANEOUS:**

A. **AUTHORIZED LAND USE:** This permit authorizes use of National Forest System lands only. This permit does not authorize the use of any private, state, or other lands.

B. **SITE PROTECTION:** The Holder will take all measures necessary to protect the environment, the natural resources, and the health and safety of all persons affected by the use and occupancy of the permit area. The Holder will comply with all federal, state, and local environmental laws and regulations.

C. **OTHER CONTACTS**: If you have any questions or concerns please contact the District Recreation/Lands Program Manager at the Hidden Springs Ranger District at (618) 658-2111. In their absence, please contact the Hidden Springs District Ranger at the same number.

*Special-Use Permit, VIE202509- Operation and Maintenance Plan*

**Appendix A – Area map**



*Special-Use Permit, VIE202509- Operation and Maintenance Plan*

## Appendix B – Point-By-Point Maintenance Map and Descriptions





*Special-Use Permit, VIE202509- Operation and Maintenance Plan*

| Point ID | Mile Post | Description | Quantity (Ton) | Type of Rock |
|---|---|---|---|---|
| 1 | 0.517 | Drain right and add CA-1 | 15 | CA-1 |
| 2 | 0.562 | Drain left and ditch left next 200' | | |
| 3 | 0.629 | Drain right | | |
| 4 | 0.648 | Clean drain out on right, reshape road | | |
| 5 | 0.702 | Add CA-1 for 50' to protect exposed tree roots, natural drain on the left | 8 | CA-1 |
| 6 | 0.741 | Drain left and add 75' of CA-1 | 12 | CA-1 |
| 7 | 0.757 | Exposed boulder ledges, build up with CA-1 and cap with CA-6, drain right every 50' to next MP | 12 | CA-1 |
| 8 | 0.779 | Continue drains right every 50' to next MP | | |
| 9 | 0.843 | Add rolling dip and armor with CA-1 | 7.5 | CA-1 |
| 10 | 0.859 | Add 75' of CA-1 | 12 | CA-1 |
| 11 | 0.879 | Low bowl area, armor with RR-3 and cap with CA-1 | 72 / 31 | RR-3 / CA-1 |
| 12 | 0.9 | Drain Left | | |
| 13 | 1.004 | Armor creek crossing with RR-3 | 15 | RR-3 |
| 14 | 1.024 | Drain Left | | |
| 15 | 1.035 | Drain Left | | |
| 16 | 1.145 | Build up with RR-3 and cap with CA-1 | 29 / 15.5 | RR-3 / CA-1 |
| 17 | 1.152 | Add water bar to send runoff to left side of road | | |
| 18 | 1.171 | Add water bar and drain right | | |
| 19 | 1.191 | Reshape the road | | |
| 20 | 1.209 | Add water bar to send runoff left and armor with CA-1 | 7.5 | CA-1 |
| 21 | 1.391 | Drain left and armor outlet with CA-1 | 12 | CA-1 |
| 22 | 1.41 | Drain left and armor crossing with CA-1 | 7.5 | CA-1 |
| 23 | 1.528 | Drain left and armor with CA-1 | 8 | CA-1 |
| 24 | 1.555 | Ditch left to next MP, reshape the road, and add some CA-1 | 12 | CA-1 |
| 25 | 1.575 | End ditch left. Drain left | | |
| 26 | 1.598 | Drain left and add some CA-1 | 7.5 | CA-1 |
| 27 | 1.61 | Remove dead tree and clean out drain left | | |
| 28 | 1.633 | Clean out drain right | | |
| 29 | 1.669 | Drain right | | |
| 30 | 1.693 | Drain left | | |
| 31 | 1.741 | Armor with CA-1 and drain left | 7.5 | CA-1 |
| 32 | 1.779 | Armor with CA-1 and drain left | 7.5 | CA-1 |
| 33 | 1.794 | Build up with RR-3 and cap with CA-1, drain left (2 spots) | 29 / 15.5 | RR-3 / CA-1 |
| 34 | 1.822 | Drain left and add CA-1 | 7.5 | CA-1 |
| 35 | 1.831 | Reshape road, drain left, and add CA-1 for 200' | 31 | CA-1 |
| 36 | 1.877 | Reshape road, drain left multiple spots, and add CA-1 for 200' | 31 | CA-1 |
| 37 | 1.934 | Reshape road, build road bed up 200' long, RR-3 capped with CA-1, and drain left | 77 / 31 | RR-3 / CA-1 |
| 38 | 2.054 | Drain left every 50' until next MP | | |
| 39 | 2.118 | Stop draining left every 50' | | |
| 40 | 2.14 | Reshape road, drain left every 50' until next MP, and add some CA-1 | 7.5 | CA-1 |
| 41 | 2.178 | Armor crossing with CA-1 and clean out drain left | | |
| 42 | 2.192 | Drain right every 50' to next MP | | |
| 43 | 2.247 | Reshape road, drain right, add CA-1 for 100' | 16 | CA-1 |
| 44 | 2.3 | Drain right and add CA-1 for 100' | 16 | CA-1 |
| 45 | 2.326 | Drain right and add CA-1 for 25' | 4 | CA-1 |
| 46 | 2.351 | Reshape road, add CA-1, and drain right every 50' until next MP | 7.5 | CA-1 |
| 47 | 2.375 | Ditch left for 200' and then drain right | | |
| 48 | 2.397 | Drain right | | |
| 49 | 2.413 | Remove old plastic culvert, armor crossing with CA-1, and drain right | 7.5 | CA-1 |
| 50 | 2.436 | Drain right and add rock next 100' | 15.5 | CA-1 |
| 51 | 2.521 | Add rock next 150' and then drain right | 23.25 | CA-1 |
| 52 | 2.544 | Drain right and add CA-1 | 7.5 | CA-1 |
| 53 | 2.562 | Drain right every 50' to next MP | | |
| 54 | 2.589 | Drain left and add CA-1 | 7.5 | CA-1 |
| 55 | 2.596 | Drain left and add CA-1 next 100' | 15 | CA-1 |

*Special-Use Permit, VIE202509- Operation and Maintenance Plan*

## Appendix C - Designated Access Road Repairs

**Phase I - Emergency Repairs:** Perform any designated access road repairs or blockages resulting from 2025 weather/storm events.   Work may require the use of chainsaws and small, tracked equipment and/or wheeled tractors.

## Phase II – Drainage, Surface Stabilization, and Erosion Mitigations

Complete maintenance/improvement tasks to the designated access road (Appendix A) and itemized on the point-by-point description (Appendix B) to achieve a 12-feet wide roadbed (maximum; no pull-offs) with an additional 4 feet on either side (maximum unless approved by Forest Service staff) allowed for drainage feature maintenance or construction.  Work may require the use of small, tracked equipment, rubber-tire tractors, and/or single-axle dump truck with utility trailers.

## Phase III — Future Routine Maintenance

Perform routine maintenance to provide safe, year-round access by full sized vehicles and OHVs (ATV or UTV) on the designated access road.  Action items include, but are not limited to, removal of down trees impeding vehicle passage, drainage feature maintenance such as debris removal, or surface grading/sloping to repair washouts.  An annual maintenance plan will be developed and submitted by each permit holder on or before May 30th each year or approval by the authorized officer prior to the work beginning. It is anticipated that road maintenance will be addressed in the annual maintenance plan and would occur at least every two years to ensure that road conditions do not deteriorate. Under all circumstances, before-and-after repairs of the road and/or designated shared-use trails, workers and landowners will keep the existing road gate closed at the Lusk Creek Wilderness boundary to provide for the safety of visitors and the public from any occupational hazards.

EXHIBIT 2

*Special-Use Permit, VIE202509- Operation and Maintenance Plan*

## Appendix D - Mitigation Measures

Pertinent Forest-wide and Wilderness Management Area standards and guidelines will be adhered to during project implementation.  All permit holders shall be responsible for developing the road maintenance schedule, coordinating steps necessary to accomplish the work, and presenting their plan to the Forest Service for annual review and/or approval.  If multiple permit holders cannot agree on maintenance responsibilities, the Forest Service will serve to resolve differences and determine a solution.   A special-use permit does not authorize access across private property, only access across Forest Service property via the designated access route.  All easements to cross private land shall be coordinated between the appropriate permit holder(s) and landowners.  The following additional mitigation measures will also be adhered to during project implementation:

**A.  Archaeology**

    1. The permit holder will protect and preserve heritage resources within the designated access road corridor.  Forest Heritage Program Manager must review maintenance plans for the road prior to work being done to keep archaeological resources along the road from being impacted.

**B.  Soil and Water Resources**

    1. Servicing and fueling equipment must be located outside of the Lusk Creek Wilderness boundary and approved by the Forest Officer.  Fuel leaks from such equipment shall be repaired immediately.  A supply of absorbent materials shall be kept on the job site for use in the event of a hazardous fluid spill. Acceptable absorbent materials are those that are manufactured specifically for the containment and clean-up of hazardous materials.

    2. Water bars and other erosion control or drainage structures (i.e. dips and drainage ditches) are to be used to prevent sediment from entering the streams.  Recommended placement interval for water bars and dips is as follows:

1%-10% Grade- every 80 feet (as ground conditions allow)

10%-30% Grade- every 50 feet (as ground conditions allow)

**C. Non-Native Invasive Species Management**

    1. Ensure that non-native invasive species (NNIS) do not become established or expanded in the Lusk Creek Wilderness by washing and inspecting construction vehicles and equipment before arriving to any work site in Wilderness.

    2. Permit holders are responsible for treating future NNIS infestations that are found in and along the access road.  Mulch may be used to cover road, trails, and/or stream banks to stop erosion. Mulch should be as weed-free as possible to prevent the spread of NNIS.

    3. Forest Service staff will inventory the access route to determine if the non-native invasive plant infestations are close enough to the road that they will be spread by using or maintaining the road. If they are, the Forest Botanist will develop an appropriate treatment plan that the permit holders will implement (either themselves or by hiring a contractor), followed by annual monitoring by Forest Service staff until the infestations are gone.

**D. Other Issues and/or Concerns**

    1. Only permit holders will be authorized to have motorized access to private property within the Lusk Creek Wilderness.  All other visitors including extended family members, relatives, and friends must be transported to the property by permit holders only.  The existing gate near New Liberty Church will be maintained by the Forest Service and a Forest Service lock will be installed and/or daisy-chained with other property owner locks.

2. Maintenance is not intended to serve passenger car traffic/use. Only high-clearance vehicles such as trucks, SUV's, and off-highway vehicles (OHVs) such as ATVs or UTVs will be used on the access road from the gate at the Lusk Creek Wilderness boundary to the private property.

3. No horses, motorcycles, or bicycles are authorized to be used on access road to gain entrance to either private property or Wilderness.

4. An annual maintenance plan will be developed and submitted by permit holders on or before May 30 with approval by the Authorized Officer prior to work beginning. It is anticipated that road maintenance will be addressed in the annual maintenance plan and would occur at least every two (2) years to ensure that road conditions do not deteriorate.

5. The access road surface will be 12 feet wide roadbed (maximum; no pull-offs) with an additional 4 feet (maximum unless approved by Forest Service staff) allowed on either side for drainage feature maintenance or construction using Forest Service standards and guidelines.

6. Minimize motorized vehicle traffic by carpooling from the boundary when multiple parties will be present at once.

7. Inspections shall be performed by the Forest Service to evaluate or determine (a) compliance with the requirements of this permit; (b) existing condition of the roadway; (c) corrective actions required to correct deficiencies. The Holder shall be notified, in writing of any unsatisfactory conditions associated with the permit and the corrective action(s) required.

8. Windfalls and live overhanging limbs and branches that present a hazard for access shall be removed by the permit holder. Any standing hazard tree to be cut shall be identified by the holder to the USFS and no standing hazard trees shall be cut and removed before they have been viewed and marked by USFS staff.

9. Damage resulting from use and maintenance operations shall be corrected as soon as practicable after the damage has occurred. If unsafe conditions exist, the Holder shall immediately perform repairs to restore safe conditions. If permanent repairs cannot be immediately implemented, temporary repairs shall be made and maintained to ensure safe conditions until permanent repairs can be implemented. All costs to repair damages shall be borne by the Holder.

10. The Holder shall maintain existing cross section of the road by shaping surface and shoulders. Undercutting of the road surface at the roadbed edges and leaving material berms along the roadbed edges is unacceptable and shall be corrected immediately.

11. No material shall be deposited in ditches or other in such places where it will interfere with road drainage. Any material inadvertently deposited shall be removed immediately. Unsuitable material resulting from grading operations shall be used as fill material for large holes/cavities in the roadbed or be evenly spread (no piling) randomly along the roadbed limits where it won't washed into streams or drainage features. Established grasses and other vegetation shall not be removed from areas outside the traveled way except as incidental from facilitating proper drainage.

12. The Holder shall perform normal seasonal clean up including removal of bank slough, minor slides, and fallen timber, replacing washed out roadbed/crown material, and cleaning out drainage ditches.

13. The Holder shall provide maintenance so that no damage occurs on adjacent National Forest land. The Holder shall construct and maintain lead-off drainage and water barriers as necessary to prevent erosion. This shall include but is not limited to removing ruts, berms or other surface irregularities, establishing adequate roadbed crown or cross slope to facilitate proper surface damage.

*Special-Use Permit, VIE202509- Operation and Maintenance Plan*

---

### Appendix E – Road Maintenance Specifications and Schedule

III. SCOPE OF WORK: Work shall be to provide a road base and surface suitable for accessing private property.  Work will include preparing the road base and periodic maintenance to establish a functional travel way.  This work will establish a roadbed that may be traveled during all weather.

IV. SCHEDULE OF WORK: For this work the Designated Official is the District Ranger or their representative as designated in writing.

  A.  Phases 1 and 2 Maintenance: This work shall commence prior to accessing the property by high clearance vehicle for the first time.
    1.  Notify the District Ranger or its staff a minimum of 48 hours in advance of any work commencing.
    2.  No deviations from the original traveled way on the ground shall be made without prior approval in writing from the District Ranger prior to work commencing.
        a.  Horizontal clearing limits shall be 9 feet either side of the road centerline.
        b.  Vertical clearing limits shall be a minimum of 14 feet above the road surface.
    3.  Use a small dozer with articulating blade, motor grader or similar piece of equipment to scarify and shape the road surface by removing potholes and wheel ruts and to establish a minimum 2% cross slope to drain.
    4.  The maximum width of traveled way at any point shall be 12 feet.
    5.  Construct ditches and lead-off ditches as identified to direct water away from the road surface to provide drainage and prevent ponding.
    6.  Contact the District Ranger or his staff prior to placing rock.
        a.  All aggregate and riprap used shall meet the gradations of Illinois Department of Transportation grades as specified herein or in Appendix B.
        b.  Minimum compacted depth of aggregate shall be as shown on the attached Appendices. Compaction shall be obtained by operating the hauling and grading equipment over the roadway.
        c.  Aggregate weigh tickets from the quarry shall be provided to the government to confirm gradation and quantity placed.
    7.  Downed limbs shall be removed from the traveled way; downed trees shall be cut a minimum of 3 feet ON either side of the road measured from the edge of road surface.
    8.  All brush, limb and downed tree debris shall be scattered a minimum of 3 feet from the edge of road and placed so as not to block drainage.

  B.  Reoccurring Maintenance:
    1.  Maintenance of the roadway shall occur when potholes and wheel ruts deeper than 4 inches occur.
    2.  Minimum maintenance shall include blading and scarifying all potholes and wheel ruts from the road surface, leaving the road with a minimum 2% cross slope to drain.  Aggregate drainages shall be reinforced as needed to maintain the road drainage.
    3.  Brushing shall occur as needed for vertical and horizontal clearance.
        a.  Minimum vertical clearance shall be 14 feet above road surface.
        b.  Maximum horizontal clearance shall be 3 feet either side of the road measured from the edge of the road surface.  No trees larger than 4 inches in diameter at 4'6" above ground shall be removed.
    4.  Downed limbs shall be removed from the traveled way; downed trees shall be cut a minimum of 3 feet either side of the road measured from the edge of road surface.

EXHIBIT 2

*Special-Use Permit, VIE202509- Operation and Maintenance Plan*

ROAD SURFACE ACTIVITIES – GRADING

Maintenance Requirements

Blading operations shall be conducted as required and shall include removal of ruts, potholes, corrugations and bumps with a scarifier. All suitable dislodged aggregate shall be smoothly redistributed over the entire road surface to provide proper cross slope or crown (2% to 4% slope). Blading area shall be from outside edge of shoulder to outside edge of shoulder on existing road surface and shall include turnouts, curve widenings and turnarounds.

Suitable moisture content of surface aggregate during blading shall be from five to fifteen percent by weight. The Permittee is responsible for ensuring that blading operations are performed within the specified moisture content limits. All suitable aggregate which has been worked onto the road shoulder by traffic or maintenance activities shall be reclaimed onto the travelway. A definite, continuous and smooth line between aggregate surface and road shoulder shall be obtained. Grass or leaf litter deposited within the travelled way shall be smoothly spread within the travelway or along the shoulder after movement sufficient to sift out surface aggregate. In some instances, hauling of excess grass or leaf litter shall be required to remove this material from the road surface simultaneously to blading operations. Disposal sites shall be locations approved by the Designated Official. The maximum haul distance required is 1 mile, undercutting of the road surface at the shoulder line and leaving material berms is unacceptable. No material shall be allowed to remain on shoulders or in ditch lines because of the motor grading operation.

Minimum blading work shall be three passes with the grader on any road section. Passes will not exceed 1 mile intervals along any length of road and at any one time without the approval of the Designated Official.

Maximum blading speed shall be such that surface aggregate rolls and mixes from the angled blade of the motor grader and such that bouncing of the motor grader and the creation of a corrugated road surface from blading operations is prevented.

Loose rocks protruding 4 inches or more above the graded surface shall be removed from the travelway. It is permissible to waste these rocks on Forest Service land, beyond the roadside mowing limits and away from drainage ditches as approved by the Designated Official.

Travelways (aggregate surface) shall be maintained over the full existing width. Dips and swales within the travelway designed to control surface drainage shall be maintained.

The equipment operator will be held responsible for any damage caused by his blading operations to utilities, the road or existing associated road structures such as culverts, header walls or bridges.

Equipment Specifications

The motor grader shall have an adjustable blade, with a minimum SAE operating weight of 12 tons, a minimum of 125 net horsepower at 2000 rpm and a 12 foot wide moldboard. The moldboard and cutting edge shall be straight and even with no more than ¼ inch of deviation from the original line or shape.

Scarifiers shall be firmly attached, spaced no more than 12 inches apart, adjusted to adequate depth and capable of scarifying at least a 6 foot width per pass.

When used for initially establishing the roadbed a dozer shall have a minimum SAE 85 horsepower and be equipped with a 6-way blade.

*Special-Use Permit, VIE202509- Operation and Maintenance Plan*

## ROAD SURFACE ACTIVITIES - SURFACE REPLACEMENT, AGGREGATE SURFACED ROADS

### Maintenance Requirements

Normal operation in this activity is replacement of surface aggregate that is lost due to surface failure, traffic wear or erosion. Work to be performed under this activity includes existing surface preparation, furnishing aggregate and spreading aggregate with a finish blading. Finish blading of surface replacement is included in this activity and the Permittee shall have the capability and may be required at times to deliver surface replacement aggregate and perform motor grader finish blading at the same time. In areas where drainage activity is required, aggregate placement will not be started until cleaning and reshaping of ditches is completed unless otherwise approved by the Designated Official.

Remove, by cutting out, all damaged areas of surface and work suitable material smoothly over the entire travelway width while disposing of unsuitable material as approved by the Designated Official. Prevent disturbing base or subgrade material that is in satisfactory condition. Deposit new aggregate in the section being worked to achieve grade, thickness and template as specified by Appendix B. Spread material evenly across the travelway and finish blade entire area receiving surface replacement aggregate in accordance with grading activies. No excess or unwanted material shall be allowed to remain on shoulders or in ditch lines because of the Permittee's operations.

Trucks hauling aggregate material shall comply with weight limits posted on the roads and bridges that are used for haul and for truck weight limits as permitted by the State of Illinois Department of Transportation.

### Materials

Coarse aggregate shall be from an approved source and meet the Illinois Department of Transportation quality and gradations CA-1, CA-5, CA-6 or CA-10 or otherwise specified in Appendix B.

*Special-Use Permit, VIE202509- Operation and Maintenance Plan*

DRAINAGE ACTIVITIES - CLEAN AND RESHAPE DITCHES

Maintenance Requirements

Ditches shall be maintained in their original location and to the design depth or to a minimum depth of 12 inches below the road shoulder and to the shape and grade required to ensure drainage of the roadway. All ditches shall be maintained free of loose sod and other loose material on the slope between the bottom of the ditch and the road shoulder. Repair to any utilities, drainage structures (i.e., culverts, etc.) and road appurtenances damaged by the Permittee during the ditching operation shall be at the Permittee's expense. Handwork may be required to properly connect ditch flow lines to drainage structure inlets/outlets and is considered a part of this activity. The Permittee is to perform drainage activities for all ditches on roads as identified in Appendix B and where grading activities are performed.

Road Ditches - All suitable material (having the same character as the road surface) that is excavated shall be reclaimed and used within the travelway as approved by the Designated Official. Unsuitable material shall be bladed out of the ditch and onto the backslope or excavated and hauled to a disposal site as approved by the Designated Official. When backslope conditions are such that the motor grader can be safely operated on the backslope, this excavated material shall be feathered up onto the backslope. The feathered material shall be bladed up onto the backslope in a manner that does not create berms or piles of material. A maximum of two passes of the motor grader is required for the feathering work. The Designated Official may designate areas that shall not receive feathering. The Permittee shall be responsible for the expense of road repair resulting from reclaiming onto the traveled way any unsuitable materials excavated from ditches.

Tail and Lead-Off Ditches - Existing ditches that are silted in or closed with other debris shall be opened to provide drainage away from the roadway. Unsuitable material excavated from tail and lead-off ditches shall not be reclaimed onto the traveled way. The Permittee shall be responsible for the expense of road repair resulting from reclaiming onto the traveled way any unsuitable materials excavated from tail and lead-off ditches.

Cleaning and reshaping of ditches shall be coordinated, planned and executed with Blading, Aggregate Surfaced Roads to blade the traveled way when suitable material excavated from ditches is utilized in the traveled way for the purpose of mixing suitable material in with the surface aggregate.

ROADWAY ACTIVITES - BRUSH CUTTING; MACHINE & HAND

Maintenance Requirements

Brush cutting shall consist of cutting and removing all living and dead vegetation and brush having a diameter of 4 inches or less at stump height with hand tools.   Use of a mechanical arm brusher attached to a piece of heavy equipment shall only be used if permission is obtained in writing from the Designated Official prior to starting work.

Brushing: The mechanical arm brusher, if allowed, shall be attached to a motor grader, wheeled tractor, or other power equipment as approved by the Designated Official. The mechanical arm brusher is intended to allow for the Permittee to drive along the side of the road and mechanically reach out and cutting the brush.  Handwork shall be performed for limbing with the use of pruning saws, power saws, nippers, bow saws or crosscuts. Limbs shall be pruned as close as possible to tree trunks.  Brush will be cut no higher than 3 inches above ground level.  Removed material shall be scattered outside the roadway.  Disposal shall include removal of brushing debris from the roadbed and ditches, pruning scarred limbs, and breaking down all brushing debris below the level of grass growth to provide a roadside strip that will facilitate future mowing.

Removal of trees, limbs, brush, and obstructions shall be limited to those which hang over the roadway obstructing a driver's sight distance; those that are within 14 feet vertical clearance above and 3 feet on each side of the roadbed; or dead snags that could fall into the travelway as shown on Exhibit F.  All fallen trees, limbs, or brush in the travelway or road ditch line shall also be placed outside of the roadway and positioned so that it does not roll back into the roadway.

EXHIBIT 2

*Special-Use Permit, VIE202509- Operation and Maintenance Plan*

**Appendix F – Sample Drawings**



*Special-Use Permit, VIE202509- Operation and Maintenance Plan*





ROADSIDE BRUSHING DETAIL
NOT TO SCALE

SHAWNEE NATIONAL FOREST

SHEET ___ OF ___

EXHIBIT C

DRAWN CLM    DATE 8/2005

*Special-Use Permit, VIE202505- Operation and Maintenance Plan*

**Non-Discrimination Statement**

In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs).  Remedies and complaint filing deadlines vary by program or incident.

Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English.

To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD-3027, found online at http://www.ascr.usda.gov/complaint_filing_cust.html  and at any USDA office or write a letter addressed to USDA and provide in the letter all of the information requested in the form. To request a copy of the complaint form, call (866) 632-9992. Submit your completed form or letter to USDA by: (1) mail: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, SW, Washington, D.C. 20250-9410; (2) fax: (202) 690-7442; or (3) email:  program.intake@usda.gov.

EXHIBIT 3

Auth ID: VIE202509
Contact Name: ROBERT HAMILTON
Expiration Date: 12/31/2034
Use Code: 754

FS-2700-4c (09/2020)
OMB No. 0596-0082

### U.S. DEPARTMENT OF AGRICULTURE
### FOREST SERVICE

### PRIVATE ROAD SPECIAL USE PERMIT
### AUTHORITY:
### WILDERNESS ACT, AS AMENDED September 3, 1964

ROBERT HAMILTON of (b) (6) ████████████████ (the holder) is authorized to use the following described private road (private road) in the SHAWNEE NATIONAL FOREST to access private property for commercial or noncommercial purposes, subject to the terms of this special use permit (permit).

The private road is located on National Forest System lands in the County of Pope, State of Illinois, is 12 feet wide and 13200 feet long, and covers approximately 3.64 acres in the Sec. 22, T. 11 S., R. 6 E., 3RD PRINCIPAL MERIDIAN, Sec. 23, T. 11 S., R. 6 E., 3RD PRINCIPAL MERIDIAN, Sec. 27, T. 11 S., R. 6 E., 3RD PRINCIPAL MERIDIAN, Sec. 34, T. 11 S., R. 6 E., 3RD PRINCIPAL MERIDIAN, Sec. 26, T. 11 S., R. 6 E., 3RD PRINCIPAL MERIDIAN, Sec. 35, T. 11 S., R. 6 E., 3RD PRINCIPAL MERIDIAN , , ("the permit area"), for the purpose of: Permit is to provide access by motorized use year-round needed to fulfill Alaska National Interest Lands Conservation Act (ANILCA) obligations for reasonable use and enjoyment of the land by the inholding owners. This access would allow the owners to use mechanized equipment to repair about 2.5 miles of road utilizing segments of the historic route and segments of the user-created routes, and conduct periodic, routine maintenance for the upkeep of the access road located within Lusk Creek Wilderness. Inholders plan on building structures and upkeeping their property using tractors and full-sized vehicles with trailers. The proposed road is approximately 2.5 miles long by 12 feet wide or 3.64 acres located in Township 11S, Range 6E, Sections 22, 23, 26, 27, 34, and 35 in Pope County, Illinois., as shown on the map attached as an appendix. This and any other appendices are hereby incorporated into this permit.

## I. GENERAL TERMS

**A. AUTHORITY.** This permit is issued pursuant to Title V of the Federal Land Policy and Management Act, 43 U.S.C. 1761-1772, and 36 CFR Part 251, Subpart B, as amended, and is subject to their provisions.

**B. AUTHORIZED OFFICER.** The authorized officer is the Forest or Grassland Supervisor, a District Ranger, or the Station, Institute, or Area Director with delegated authority pursuant to Forest Service Manual 2700.

**C. TERM.** This permit shall expire at midnight on **12/31/2034**. Expiration of this permit shall not require notice, a decision document, or any environmental analysis or other documentation.

**D. CONTINUATION OF USE AND OCCUPANCY.** This permit is not renewable. Prior to expiration of this permit, the holder may apply for a new permit for the use and occupancy authorized by this permit. Applications for a new permit must be submitted at least 6 months prior to expiration of this permit. Issuance of a new permit is at the sole discretion of the authorized officer. At a minimum, before issuing a new permit, the authorized officer shall ensure that (1) the use and occupancy to be authorized by the new permit are consistent with the standards and guidelines in the applicable land management plan; (2) the type of use and occupancy to be authorized by the new permit is the same as the type of use and occupancy authorized by this permit; and (3) the holder is in compliance with all the terms of this permit. The authorized officer may prescribe new terms when a new permit is issued.

**E. AMENDMENT.** This permit may be amended in whole or in part by the Forest Service when, at the discretion of the authorized officer, such action is deemed necessary or desirable to incorporate new terms that may be required by law, regulation, directive, the applicable land management plan, or projects and activities implementing the land management plan pursuant to 36 CFR Part 218.

**F. COMPLIANCE WITH LAWS, REGULATIONS, AND OTHER LEGAL REQUIREMENTS.** In exercising the rights and privileges granted by this permit, the holder shall comply with all present and future federal laws and regulations and all present and future state, county, and municipal laws, regulations, and other legal requirements that apply to the permit

EXHIBIT 3

area, to the extent they do not conflict with federal law, regulation, or policy. The Forest Service assumes no responsibility for enforcing laws, regulations, and other legal requirements that fall under the jurisdiction of other governmental entities.

**G. NON-EXCLUSIVE USE.** The use or occupancy authorized by this permit is not exclusive. The Forest Service reserves the right to use or cross upon, over, or under the private road and authorize others to use or cross upon, over, or under the private road in any way that is not inconsistent with the holder's rights and privileges under this permit, after consultation with all parties involved, provided that:

(a) When the Forest Service uses the private road for commercial hauling, other than removal of timber cut during construction or maintenance of the private road or other occasional incidental use, the Forest Service shall pay or perform its pro-rata share of maintenance and construction costs of the private road; and

(b) The Forest Service shall require users to pay the holder or perform their pro-rata share of the current replacement cost of the private road, less depreciation, to reconstruct the private road as necessary to accommodate their use and perform road maintenance commensurate with their use.

The Forest Service reserves the right of access to the permit area, including a continuing right of physical entry to the permit area for inspection, monitoring, or any other purpose consistent with any right or obligation of the United States under any law or regulation, including ensuring compliance with the terms of this permit. The Forest Service reserves the right to relocate the private road to the extent necessary to accommodate the management needs of the National Forest System. The centerline of this permit shall shift to follow the centerline of the relocated private road and shall be accepted as the new centerline of this permit. Except for any restrictions that the holder and the authorized officer agree are necessary to protect the installation and operation of authorized temporary improvements, the lands and waters covered by this permit shall remain open to the public for all lawful purposes.

**H. ASSIGNABILITY.** This permit is not assignable or transferable.

**I. TRANSFER OF TITLE TO THE IMPROVEMENTS**

1. Notification of Transfer. The holder shall notify the authorized officer when a transfer of title to the private property accessed by the private road is planned.

2. Transfer of Title. Any transfer of title to the private property accessed by the private road shall result in termination of this permit. The party who acquires title to the private property must submit an application for a permit. The Forest Service is not obligated to issue a new permit to the party who acquires title to the private property accessed by the private road. The authorized officer shall determine that the applicant meets requirements under applicable federal regulations.

**II. IMPROVEMENTS**

**A. LIMITATIONS ON USE.** Nothing in this permit gives or implies permission to build or maintain any structure or facility or to conduct any activity unless specifically provided for in this permit. Any use not specifically authorized by this permit must be proposed in accordance with 36 CFR 251.54 or 251.61. Approval of such a proposed use through issuance of a new permit or permit amendment is at the sole discretion of the authorized officer.

**B. DRAWINGS.** All drawings for construction or reconstruction of the private road, as well as revisions to those drawings, must be prepared by a professional engineer, architect, landscape architect, or other qualified professional acceptable to the authorized officer. These drawings and drawing revisions must have written approval from the authorized officer before they are implemented. The authorized officer may require the holder to furnish as-built drawings, maps, or surveys upon completion of the work.

**C. RELOCATION.** This permit is issued with the express understanding that should future location of federally owned improvements or road rights-of-way require relocation of the private road, the relocation will be conducted by and at the expense of the holder within a reasonable period specified by the authorized officer.

**III. OPERATIONS**

**A. OPERATING PLAN.** The holder shall prepare an operating plan by May 30 each year and shall revise it as needed to

EXHIBIT 3

address changes in operations. The operating plan and any revisions to the operating plan shall be prepared in consultation with the authorized officer or the authorized officer's designated representative and shall cover such items as snow removal, road maintenance, commercial hauling, dust abatement, a traffic control plan, and the names of the holder's employees, contractors, and subcontractors who will use the private road on behalf of the holder under this permit. The operating plan shall be submitted by the holder and approved by the authorized officer or the authorized officer's designated representative prior to commencement of operations under this permit and shall be attached to this permit as an appendix.

**B. USE OF THE PRIVATE ROAD.** The holder shall have the right to use the private road without cost, other than the consideration provided for in this permit, for all purposes deemed necessary or desirable by the holder in connection with the protection, administration, management, and utilization of the holder's lands and other property.

**C. HOLDER'S RESPONSIBILITY FOR ROAD MAINTENANCE.** Any road maintenance performed by the holder shall be authorized by and shall be conducted in accordance with a maintenance plan approved in writing by the authorized officer. Maintenance, construction, or reconstruction of the private road to accommodate the holder's needs must have prior written approval from the authorized officer and shall be performed at the holder's expense.

**D. RESOURCE PROTECTION DURING ROAD MAINTENANCE.** The holder shall conduct any maintenance of the private road so as to avoid damaging adjacent National Forest System lands. The holder shall construct and maintain lead-off drainage and water barriers as necessary to prevent erosion.

**E. CUTTING, DISPOSAL, AND PLANTING OF VEGETATION.** This permit does not authorize the cutting of trees, brush, shrubs, and other plants ("vegetation"). Vegetation may be cut, destroyed, or trimmed only after the authorized officer or the authorized officer's designated representative has approved in writing and marked or otherwise identified what may be cut, destroyed, or trimmed. The holder shall notify the authorized officer when approved cutting, destruction, or trimming of vegetation has been completed. The Forest Service shall determine in advance of felling the method of disposal of trees felled in the permit area that meet utilization standards. Disposal may be by sale or without charge per 36 CFR Part 223, as may be most advantageous to the United States. Debris from felling that does not meet utilization standards shall also be disposed of according to methods determined by the Forest Service. Planting of vegetation in the permit area must have prior written approval from the authorized officer.

**F. PESTICIDE USE**

1. Authorized Officer Concurrence. Pesticides may not be used in the permit area to control pests, including undesirable woody and herbaceous vegetation (including aquatic plants), insects, birds, rodents, or fish without prior written concurrence of the authorized officer. Only those products registered or otherwise authorized by the U.S. Environmental Protection Agency and appropriate State authority for the specific purpose planned shall be authorized for use within areas on National Forest System lands.

2. Pesticide-Use Proposal. Requests for concurrence of any planned uses of pesticides shall be provided in advance using the Pesticide-Use Proposal (form FS-2100-2). Annually the holder shall, on the due date established by the authorized officer, submit requests for any new, or continued, pesticide usage. The Pesticide-Use Proposal shall cover a 12-month period of planned use. The Pesticide-Use Proposal shall be submitted at least 60 days in advance of pesticide application. Information essential for review shall be provided in the form specified. Exceptions to this schedule may be allowed, subject to emergency request and approval, only when unexpected outbreaks of pests require control measures which were not anticipated at the time a Pesticide-Use Proposal was submitted.

3. Safety Plan. Before applying pesticides in the permit area, the holder shall submit to the authorized officer a safety plan that includes, at a minimum, a precise statement of the treatment objectives; a description of equipment, materials, and supplies to be used, including pesticide formulation, quantities, and application methods; a description of the lines of responsibility for project planning, project monitoring, and after-action review; a description of any necessary interagency coordination; a copy of the current Pesticide-Use Proposal for the permit; a description of the process by which treatment effectiveness will be determined; and a spill plan, communications plan, security plan, and, when required by applicable local requirements, a provision for prior notification to sensitive individuals.

4. Reporting. By September 30th annually, the holder shall submit to the authorized officer a written report of each pesticide application project completed during the previous 12-month period. The report shall contain information pertaining to the pesticide application projects as requested by the authorized officer.

5. Labeling, Laws, and Regulations. Label instructions and all applicable laws and regulations shall be strictly followed in the application of pesticides and disposal of excess materials and containers. No pesticide waste, excess materials, or containers shall be disposed of in any area administered by the Forest Service.

EXHIBIT 3

**G. MONITORING BY THE FOREST SERVICE.** The Forest Service shall monitor the holder's operations and reserves the right to inspect the permit area and authorized facilities and improvements at any time for compliance with the terms of this permit. The holder shall comply with inspection requirements deemed appropriate by the authorized officer. The holder's obligations under this permit are not contingent upon any duty of the Forest Service to inspect the permit area or authorized facilities or improvements. A failure by the Forest Service or other governmental officials to inspect is not a justification for noncompliance with any of the terms of this permit.

**IV. RIGHTS AND LIABILITIES**

**A. VALID EXISTING RIGHTS.** This permit is subject to all valid existing rights. Valid existing rights include those derived from mining and mineral leasing laws of the United States. The Forest Service is not liable to the holder for the exercise of any such right.

**B. ABSENCE OF THIRD-PARTY BENEFICIARY RIGHTS.** The parties to this permit do not intend to confer any rights on any third party as a beneficiary under this permit.

**C. NO WARRANTY OF ACCESS, SITE SUITABILITY, OR SERVICES.** This permit authorizes the use and occupancy of National Forest System lands for the purposes identified in this permit. The Forest Service does not make any express or implied warranty of access to the permit area, of the suitability of the permit area for the authorized uses, or for the furnishing of road or trail maintenance, other than as expressly provided for in this permit; water; fire protection services; search and rescue services; or any other services by a government agency, utility, association, or individual. **D. RISK OF LOSS.** The holder assumes all risk of loss of use and occupancy of the permit area, in whole or in part, due to public health and safety or environmental hazards. Loss of use and occupancy of the permit area may result from but is not limited to theft, vandalism, fire and any fire-fighting activities (including prescribed burns), environmental contamination, avalanches, rising waters, winds, falling limbs or trees, and other forces of nature. If the authorized officer determines that any portions of the permit area cannot be safely occupied due to a public health or safety or environmental hazard, this permit shall terminate as to those portions of the permit area. Termination under this clause shall not give rise to any claim for damages, including lost profits, by the holder against the Forest Service.

**E. DAMAGE TO UNITED STATES PROPERTY.** The holder has an affirmative duty to protect from damage the land, property, and other interests of the United States that are associated with the use and occupancy authorized by this permit. Damage includes but is not limited to destruction of or damage to National Forest System lands, fire suppression costs, and destruction of or damage to federally owned improvements.

1. The holder shall be liable for all injury, loss, or damage, including fire suppression costs, prevention and control of the spread of invasive species, and the costs of rehabilitation or restoration of natural resources, resulting from the holder's use and occupancy of the permit area. Compensation shall include but not be limited to the value of resources damaged or destroyed, the costs of restoration, cleanup, or other mitigation, fire suppression or other types of abatement costs, and all administrative, legal (including attorney's fees), and other costs.

2. The holder shall be liable for damage to all roads and trails of the United States caused by use of the holder or the holder's heirs, assignees, agents, employees, or contractors to the same extent as provided under clause IV.E.1, except that liability shall not include reasonable and ordinary wear and tear.

**F. ENVIRONMENTAL PROTECTION**

1. Compliance with Environmental Laws. The holder shall in connection with the use and occupancy authorized by this permit comply with all applicable federal, state, and local environmental laws and regulations, including but not limited to those established pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), as amended, 42 U.S.C. 9601 et seq., the Resource Conservation and Recovery Act, as amended, 42 U.S.C. 6901 et seq., the Federal Water Pollution Control Act, as amended, 33 U.S.C. 1251 et seq., the Oil Pollution Act, as amended, 33 U.S.C. 2701 et seq., the Clean Air Act, as amended, 42 U.S.C. 7401 et seq., the Toxic Substances Control Act, as amended, 15 U.S.C. 2601 et seq., the Federal Insecticide, Fungicide, and Rodenticide Act, as amended, 7 U.S.C. 136 et seq., and the Safe Drinking Water Act, as amended, 42 U.S.C. 300f et seq.

2. Definition of Hazardous Material. For purposes of clause IV.F, "hazardous material" shall mean (a) any hazardous substance under section 101(14) of CERCLA, 42 U.S.C. 9601(14); (b) any pollutant or contaminant under section 101(33) of CERCLA, 42 U.S.C. 9601(33); (c) any petroleum product or its derivative, including fuel oil, and waste oils; and (d) any hazardous substance, extremely hazardous substance, toxic substance, hazardous waste, ignitable, reactive or corrosive

EXHIBIT 3

materials, pollutant, contaminant, element, compound, mixture, solution or substance that may pose a present or potential hazard to human health or the environment under any applicable environmental laws.

3. Oil Discharges and Release of Hazardous Materials. The holder shall immediately notify all appropriate response authorities, including the National Response Center and the authorized officer or the authorized officer's designated representative, of any oil discharge or of the release of a hazardous material in the permit area in an amount greater than or equal to its reportable quantity, in accordance with 33 CFR Part 153 and 40 CFR Part 302. For the purposes of this requirement, "oil" is as defined by section 311(a)(1) of the Clean Water Act, 33 U.S.C. 1321(a)(1). The holder shall immediately notify the authorized officer or the authorized officer's designated representative of any release or threatened release of any hazardous material in or near the permit area which may be harmful to public health or welfare or which may adversely affect natural resources on federal lands.

4. Remediation of Release of Hazardous Materials. The holder shall remediate any release, threat of release, or discharge of hazardous materials that occurs in connection with the holder's activities in the permit area, including activities conducted by the holder's agents, employees, or contractors and regardless of whether those activities are authorized under this permit. The holder shall perform remediation in accordance with applicable law immediately upon discovery of the release, threat of release, or discharge of hazardous materials. The holder shall perform the remediation to the satisfaction of the authorized officer and at no expense to the United States. Upon revocation or termination of this permit, the holder shall deliver the permit area to the Forest Service in compliance with all applicable laws and regulations and free and clear of contamination.

G. **INDEMNIFICATION OF THE UNITED STATES.** The holder shall indemnify, defend, and hold harmless the United States for any costs, damages, claims, liabilities, and judgments arising from past, present, and future acts or omissions of the holder in connection with the use and occupancy authorized by this permit. This indemnification and hold harmless provision includes but is not limited to acts and omissions of the holder or the holder's heirs, assignees, agents, employees, contractors, or lessees in connection with the use and occupancy authorized by this permit which result in (1) violations of any laws and regulations which are now or which may in the future become applicable; (2) judgments, claims, demands, penalties, or fees assessed against the United States; (3) costs, expenses, and damages incurred by the United States; or (4) the release or threatened release of any hazardous material into the environment. The authorized officer may prescribe terms that allow the holder to replace, repair, restore, or otherwise undertake necessary curative actions to mitigate damages in addition to or as an alternative to monetary indemnification.

**V. LAND USE FEE AND DEBT COLLECTION**

**LAND USE FEE.** Per 42 U.S.C. 15925, the holder shall pay in advance an annual land use fee as determined in accordance with the Per Acre Rent Schedule established by 43 CFR 2806.20. The initial annual land use fee shall be prorated if less than 6 months in the calendar year remain on the date this permit is issued. Otherwise, the holder shall pay the entire initial annual land use fee.

**B. LAND USE FEE PAYMENTS**

1. Crediting of Payments. Payments shall be credited on the date received by the deposit facility, except that if a payment is received on a non-workday, the payment shall not be credited until the next workday.

2. Disputed Land Use Fees. Land use fees are due and payable by the due date. Disputed land use fees, other than land use fees recalculated pursuant to an audit, must be paid in full. Adjustments will be made if dictated by an administrative appeal decision, a court decision, or settlement terms.

3. Late Payments

(a) Interest. Pursuant to 31 U.S.C. 3717 et seq., interest shall be charged on any land use fee not paid within 30 days from the date it became due. The rate of interest assessed shall be the higher of the Prompt Payment Act rate or the rate of the current value of funds to the United States Treasury (i.e., the Treasury tax and loan account rate), as prescribed and published annually or quarterly by the Secretary of the Treasury in the Federal Register and the Treasury Fiscal Requirements Manual Bulletins. Interest on the principal shall accrue from the date the land use fee is due.

(b) Administrative Costs. If the account becomes delinquent, administrative costs to cover processing and handling the delinquency shall be assessed.

EXHIBIT 3

(c) Penalties. A penalty of 6% per annum shall be assessed on the total amount that is more than 90 days delinquent and shall accrue from the same date on which interest charges begin to accrue.

4. <u>Administrative Offset and Credit Reporting</u>. Delinquent land use fees and other charges associated with this permit shall be subject to all rights and remedies afforded the United States pursuant to 31 U.S.C. 3711 et seq. and common law. Delinquencies are subject to any or all of the following:

(a) Administrative offset of payments due the holder from the Forest Service.
(b) If in excess of 90 days, referral to the United States Department of the Treasury for appropriate collection action as provided by 31 U.S.C. 3711(g)(1).
(c) Offset by the Secretary of the Treasury of any amount due the holder, as provided by 31 U.S.C. 3720 et seq.
(d) Disclosure to consumer or commercial credit reporting agencies.

## VI. <u>REVOCATION, SUSPENSION, AND TERMINATION</u>
### A. <u>REVOCATION AND SUSPENSION</u>

1. The authorized officer may revoke or suspend this permit in whole or in part:

(a) For noncompliance with federal, state, or local law;

(b) For noncompliance with the terms of this permit;

(c) For abandonment or other failure of the holder to exercise the privileges granted; or

(d) At the discretion of the authorized officer, for specific and compelling reasons in the public interest.

2. The authorized officer may revoke this permit in its entirety at the request of the holder. Revocation at the request of the holder must be agreed to in writing by the authorized officer. As a condition of revocation of this permit at the request of the holder, the authorized officer has discretion to impose any terms deemed appropriate as provided for in this permit.

3. Prior to revocation or suspension, other than revocation at the request of the holder under clause VI.A.2 and immediate suspension under clause VI.B, the authorized officer shall give the holder written notice of the grounds for revocation or suspension and a reasonable period, typically not to exceed 90 days, to cure any noncompliance.

**B. <u>IMMEDIATE SUSPENSION</u>.** The authorized officer may immediately suspend this permit in whole or in part when necessary to protect public health or safety or the environment. The suspension decision shall be in writing. The holder may request an onsite review with the authorized officer's superior of the adverse conditions prompting the suspension. The authorized officer's superior shall grant this request within 48 hours. Following the onsite review, the authorized officer's superior shall promptly affirm, modify, or cancel the suspension.

**C. <u>APPEALS AND REMEDIES</u>.** Written decisions by the authorized officer relating to administration of this permit are subject to administrative appeal pursuant to 36 CFR Part 214, as amended. Revocation or suspension of this permit shall not give rise to any claim for damages by the holder against the Forest Service.

**D. <u>TERMINATION</u>.** This permit shall terminate when by its terms a fixed or agreed upon condition, event, or time occurs without any action by the authorized officer. Termination of this permit shall not require notice, a decision document, or any environmental analysis or other documentation. Termination of this permit is not subject to administrative appeal and shall not give rise to any claim for damages by the holder against the Forest Service. In addition to termination under clause I.I, this permit shall terminate:

1. Upon expiration;
2. Prior to expiration, at such time when the authorized officer, in consultation with the holder, determines that the private road is no longer needed for access to the holder's lands;
3. If the holder fails to pay land use fees, interest, or any other charges within 90 calendar days of the due date; the holder shall remain responsible for the delinquent charges; or
4. If a subsequent easement is granted by the United States to a public road authority for operation of the private road as a public highway.

**E. <u>RIGHTS AND RESPONSIBILITIES UPON REVOCATION OR TERMINATION WITHOUT ISSUANCE OF A NEW PERMIT</u>.** Upon revocation of this permit or termination of this permit without issuance of a new permit, the authorized officer, after consultation with other affected agencies, has the discretion to require the holder to sell or remove all

EXHIBIT 3

structures and improvements in the permit area, except those owned by the United States, within a reasonable period prescribed by the authorized officer and to restore the permit area to the satisfaction of the authorized officer. If the holder fails to sell or remove all structures or improvements in the permit area within the prescribed period, they shall become the property of the United States and may be sold, destroyed, or otherwise disposed of without any liability to the United States. However, the holder shall remain liable for all costs associated with their removal, including costs of sale and impoundment, cleanup, and restoration of the permit area.

**F. CONTINUATION OF OBLIGATIONS AND LIABILITIES BEYOND TERMINATION OR REVOCATION.** Notwithstanding the termination or revocation of this permit, its terms shall remain in effect and shall be binding on the holder and the holder's personal representative, successors, and assignees until all the holder's obligations and liabilities accruing before or as a result of termination or revocation of this permit have been satisfied.

## VII. MISCELLANEOUS PROVISIONS

**A. MEMBERS OF CONGRESS.** No member of or delegate to Congress or resident commissioner shall benefit from this permit either directly or indirectly, except to the extent the authorized use provides a general benefit to a corporation.

**B. CURRENT ADDRESSES.** The authorized officer and the holder shall keep each other informed of current mailing addresses, including those necessary for payment of land use fees.

**C. SUPERSEDED AUTHORIZATION.** This permit supersedes an authorization designated N/A, dated N/A.

**D. SUPERIOR CLAUSES.** If there is any conflict between any of the preceding printed clauses and any of the following clauses, the preceding printed clauses shall control.

**E. Ownership Change** (R9-X1). Holder shall immediately advise the authorized officer in the likelihood of any ownership changes affecting the operations authorized by this permit. The holder will inform the prospective buyer of the authorization and recommend contact with the authorized officered before a new permit application is submitted.

**F. Information from Holders** (R9-X4). As a condition of this authorization the holder is responsible for providing the authorized officer with any information in possession necessary for determining annual rental fees, ownership, or other matters concerning the administration of the authorized use by the Forest Service.

**THIS PERMIT IS ACCEPTED SUBJECT TO ALL ITS TERMS. BEFORE THIS PERMIT IS ISSUED TO AN ENTITY, DOCUMENTATION MUST BE PROVIDED TO THE AUTHORIZED OFFICER OF THE AUTHORITY OF THE SIGNATORY FOR THE ENTITY TO BIND IT TO THE TERMS OF THIS PERMIT.**

ACCEPTED:

_____
HOLDER NAME, PRECEDED BY NAME AND TITLE                    SIGNATURE                        DATE
OF PERSON SIGNING ON BEHALF OF HOLDER,
IF HOLDER IS AN ENTITY

APPROVED:

_____

Felipe Cano                                                                                 DATE
Forest Supervisor
Shawnee National Forest - USDA Forest Service

According to the Paperwork Reduction Act of 1995, an agency may not conduct or sponsor, and a person is not required to respond, to a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0596-0082. Response to this collection of information is mandatory. The authority to collect the information is the Organic Administration Act, 16 U.S.C. 551. The time required to complete this information collection is estimated to average 1 hour per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information.

EXHIBIT 3

In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.

Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible agency or USDA's TARGET Center at (202) 720-2600 (voice and TYY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English.

To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD-3027, found online at How to File a Program Discrimination Complaint and at any USDA office or write a letter addressed to USDA and provide in the letter all of the information requested in the form. To request a copy of the complaint form, call (866) 632-9992. Submit your completed form or letter to USDA by: (1) mail: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, SW, Washington, D.C. 20250-9410; (2) fax: (202) 690-7442; or (3) email: program.intake@usda.gov.

USDA is an equal opportunity provider, employer, and lender.

The Privacy Act of 1974 (5 U.S.C. 552a) and the Freedom of Information Act (5 U.S.C. 552) govern the confidentiality to be provided for information received by the Forest Service.